Jon F. Sands
Sweetbaum Sands Anderson PC
1125 17th St., Suite 2100
Denver, CO 80202
303-296-3377
jsands@sweetbaumsands.com

Julie Nye Tiedeken
Wyoming Bar #5-1949
McKellar, Tiedeken & Scoggin, LLC
P.O. Box 748
Cheyenne, WY 82003-0748
307.637.5575
307.637-5515
jtiedeken@mtslegal.net

ATTORNEYS FOR
COUNTERCLAIM-DEFENDANT
UMIA INSURANCE, INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF OF NEW YORK | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 15-CV31-J ) |
| POWELL HOSPITAL DISTRICT, POWELL VALLEY HEALTHCARE, INC., HEALTHTECH MANAGEMENT SERVICES, INC., JEFFREY HANSEN, M.D. and WILLIAM D. PATTEN, | ) ) ) ) ) ) |
| Defendants. | ) ) |
| AND | ) ) |
| HEALTHTECH MANAGEMENT SERVICES, INC. and WILLIAM D. PATTEN, | ) ) ) |
| Counterclaimants | ) ) |
| v. | ) ) ) |
| UMIA INSURANCE, INC. and LEXINGTON INSURANCE COMPANY | ) ) |

|  | ) |
| Counterclaim-Defendants | ) |
|  | ) |
| AND | ) |
|  | ) |
| POWELL HOSPITAL DISTRICT, POWELL | ) |
| VALLEY HEALTH CARE, INC., and JEFFREY | ) |
| HANSEN, M.D., | ) |
|  | ) |
| Cross-Claimants, | ) |
|  | ) |
| v. | ) |
|  | ) |
| UMIA INSURANCE, INC., and LEXINGTON | ) |
| INSURANCE COMPANY | ) |
|  | ) |
| Crossclaim-Defendants. | ) |

**ANSWER OF UMIA INSURANCE, INC. TO HEALTHTECH MANAGEMENT SERVICES, INC.'S AND WILLIAM D. PATTEN'S COUNTERCLAIM AGAINST UMIA INSURANCE, INC.; COUNTERCLAIM AND CROSS-CLAIM AGAINST HEALTHTECH MANAGEMENT SERVICES, INC.; WILLIAM D. PATTEN; POWELL VALLEY HOSPITAL DISTRICT; POWELL VALLEY HEALTHCARE, INC.; AND JEFFREY HANSEN**

<u>**ANSWER TO FIRST AMENDED COUNTERCLAIM OF HEALTHTECH MANAGEMENT SERVICES, INC. AND WILLIAM D. PATTEN**</u>

UMIA Insurance, Inc. ("UMIA") respectfully submits this Answer to the First Amended Counterclaim of HealthTech Management Services, Inc. ("HTMS") and William D. Patten ("Patten").

1.      Admitted on information and belief.

2.      Admitted.

3-4.      UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 3 and 4.

5.      Admitted upon information and belief.

6.     UMIA admits that the quoted language appears in the Agreement for Management Services dated November 1, 2010, between Powell Valley Healthcare, Inc. and HealthTech Management Services, Inc., referred to therein and in this pleading as "HTMS" (the "Management Agreement").  The Management Agreement speaks for itself, and is attached hereto as Exhibit 1.

7.     The Management Agreement speaks for itself.  UMIA admits that the quoted language appears in the Management Agreement.

8.     Paragraph 8 contains no allegations of material fact requiring a response.  To the extent paragraph 8 is construed to require a response, the allegations contained therein are denied.

9.     UMIA admits that HTMS has been named in certain civil actions arising from alleged malpractice of physician Jeffrey Hansen.  As of the date of this pleading, UMIA admits upon information and belief that the persons named in paragraph 9 have filed such civil actions.

10.    UMIA admits that Patten has been named in certain civil actions arising from alleged malpractice of physician Jeffrey Hansen.  As of the date of this pleading, UMIA admits upon information and belief that the persons named in paragraph 10 have filed such civil actions.

11-12. UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 11 and 12.

13.    UMIA admits upon information and belief that Homeland issued a policy of insurance to Powell Valley Health Care ("PVHC") with a policy period of August 1, 2013 to August 1, 2014.  UMIA is without sufficient knowledge or information sufficient to admit or deny the allegations contained in paragraph 13, therefore the allegations are denied.

14.     Upon information and belief, UMIA admits the allegations contained in paragraph 14.

15.     UMIA admits that it issued policy numbered WY920017 to PVHC (the "UMIA Policy"); admits that the date of inception of the UMIA policy is August 1, 2014; admits that the policy expired by its terms on August 1, 2015.  UMIA affirmatively states that the UMIA Policy speaks for itself, and denies incomplete paraphrasing and description of that policy.

16.     UMIA admits that HTMS is an Additional Insured under the terms of the UMIA Policy.  UMIA admits that Patten is an insured by definition under the terms of the UMIA Policy.

17.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17.

18.     UMIA admits that the term of the Homeland Policy is stated to be August 1, 2013 to August 1, 2014, and that the term of the UMIA Policy is August 1, 2014 to August 1, 2015. UMIA is without sufficient knowledge or information sufficient to admit or deny the allegations as they are stated in paragraph 18, therefore the allegations are denied.

19–27.   UMIA admits the allegations in paragraphs 19 to and including 27 to the extent they pertain to UMIA.  UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 19, 20, 21, 22, 23, 24, 25, 26 and 27 to the extent they do not pertain to UMIA, therefore the allegations are denied.

28.     Paragraph 28 contains no allegations against UMIA.  Therefore, no response is required. To the extent any allegation contained in paragraph 28 is construed to contain any allegation against UMIA to which a response is required, any such allegation is denied.

29.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29, therefore the allegations are denied.

30.     Admitted.

31.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31, therefore the allegations are denied

32.     UMIA is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32.  UMIA affirmatively states that HTMS and Patten were aware, or reasonably should have been aware, prior to the events described in paragraph 32, of events arising out of the rendering or failure to render medical professional services as defined in the UMIA Policy which could give rise to claims, and of the existence of potential claims prior to the inception date of the UMIA Policy.

33.     Denied.

34.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34.

35-37.  UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 35, 36 and 37.

38.     UMIA affirmatively states that pleadings in the underlying actions speak for themselves, and allegations comprising paraphrasing, partial phrasing or statements inconsistent therewith are denied.

39.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39, therefore the allegations are denied.

40.     UMIA affirmatively states that pleadings in the underlying actions speak for themselves, and allegations comprising paraphrasing, partial phrasing or statements inconsistent therewith are denied.

41.     UMIA affirmatively states that pleadings in the underlying actions speak for themselves, and allegations comprising paraphrasing, partial phrasing or statements inconsistent therewith are denied.

42.     Denied.  UMIA admits that HTMS made inquiries of UMIA as to its coverage position.

43.     Admitted.

44.     Denied as argumentative.  UMIA admits that an exchange of correspondence occurred, and the correspondence and communications speak for themselves.

45.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45, therefore the allegations are denied.

46.     UMIA admits the existence of the letter dated February 6, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the Stambaugh complaint naming HTMS as a defendant was filed and served on August 5, 2014, and August 27, 2014, respectively; and denies all remaining allegations contained in paragraph 46.

47.     UMIA admits the existence of the letter dated February 6, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the Oliver complaint naming HTMS and Patten as defendants was filed and served on August 15, 2014, and denies all remaining allegations contained in paragraph 47.

48.     UMIA admits the existence of the letter dated February 6, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the Sommerville

complaint naming HTMS as a defendant was filed on September 22, 2014, and denies all remaining allegations contained in paragraph 48.

49.     UMIA admits the existence of the letter dated February 6, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the Snell complaint naming HTMS and Patten as defendants was filed on September 12, 2014, and denies all remaining allegations contained in paragraph 49.

50.     UMIA admits the existence of the letter dated February 6, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the Johnson complaint naming HTMS as a defendant was filed on September 29, 2014, and denies all remaining allegations contained in paragraph 50.

51.     UMIA admits the existence of the letter dated February 10, 2015, affirmatively states that the letter speaks for itself; admits upon information and belief that the DiPilla complaint naming HTMS and Patten as defendants was filed on January 20, 2015, and denies all remaining allegations contained in paragraph 51.

52-54.  UMIA admits the allegations contained in paragraphs 52, 53 and 54.

55.     The allegations contained in paragraph 55 are denied as stated.  UMIA admits that it has denied the claims referenced because, among other reasons, the claims were not first made during the UMIA Policy period.  HTMS and Patten were aware, or reasonably should have been aware, of the existence of potential claims prior to August 1, 2014.  As further basis for denial, in this action, HTMS and Patten admit that the claims were made during the Homeland policy period.   Coverage B does not apply because the claims arise from **medical professional services.**

56.     Denied.

57.     Denied.

58.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58, except that UMIA denies that the Medical Review Panel Proceedings are part of the Insurance Claims to the extent HTMS and Patten allege that any legal costs and expenses are covered under the UMIA policy.

59.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59.

60.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60.

61.     Admitted on information and belief.

62.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62.

63.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63.

64.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64.

65.     UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65.

66.     UMIA incorporates its previous admissions, denials and responses as set forth above verbatim.

67.     UMIA admits the existence of the UMIA Policy, which speaks for itself.  UMIA is without sufficient knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 67, therefore the allegations are denied.

68.     Denied.   UMIA admits that HTMS is an additional insured under the UMIA policy, subject to all terms and conditions stated therein.

69-75.   Each and every allegation contained in paragraphs 69, 70, 71, 72, 73, 74 and 75 to the extent they pertain to UMIA.

76.     UMIA incorporates its previous admissions, denials and responses as set forth above verbatim.

77.     Paragraph 77 contains a legal conclusion to which no response is required.  To the extent paragraph 77 is construed to require a response, UMIA admits that pursuant to Wyoming law, a duty of good faith and fair dealing is implied into insurance contracts.

78-79.   Paragraphs 78 and 79 contain legal conclusions to which no response is required.  To the extent paragraphs 78 or 79 are construed to require a response, UMIA admits that pursuant to Wyoming law, a duty of good faith and fair dealing is implied into insurance contracts.

80.     To the extent they pertain to UMIA, each and every allegation is denied, including those contained in subparagraphs a. – f.

81.     Denied to the extent the allegations pertain to UMIA.

82.     UMIA admits that it has not paid for settlement of the referenced claims but denies the allegation that it has failed to settle the referenced claims.  UMIA affirmatively states that it owes no duty of indemnity for those claims and denies all other allegations contained in paragraph 82.

83-84.   Each and every allegation contained in paragraphs 83 and 84 is denied to the extent they pertain to UMIA.

85.     UMIA incorporates its previous admissions, denials and responses as set forth above verbatim.

86.     The allegations are denied to the extent they pertain to UMIA.

87.     UMIA denies the allegations contained in paragraph 87 to the extent they pertain to UMIA.  UMIA further states that as alleged by HTMS and Patten in paragraphs 52, 53, 54 it has agreed to defend HTMS and Patten under reservation of rights in the Brinkerhoff, Eller and McMillen claims, therefore there has been no denial of those claims.  UMIA admits that it has denied coverage to HTMS and Patten in the Stambaugh, Sommerville, Oliver, Snell, Johnson and DiPilla claims.

88.     Denied to the extent the allegations pertain to UMIA.

89.     Denied to the extent the allegations pertain to UMIA.

90.     UMIA incorporates its previous admissions, denials and responses as set forth above verbatim.

91.     Admitted.

92.     UMIA admits that a controversy for adjudication exists but denies that either HTMS or Patten is entitled to the relief sought.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Counterclaim is barred because, at a minimum, coverage was fairly debatable.

### Second Affirmative Defense

The Counterclaim is barred because of the breach of the Insurance Contract by HTMS and Patten.  Specifically, Patten, and therefore HTMS and PVHC, in the application signed by Patten on June 19, 2014, failed to disclose information about claims or potential claims that was

material to the acceptance by UMIA of the risk.  Had UMIA known of the material information, it would not have issued the UMIA Policy.

**Third Affirmative Defense**

HTMS and Patten are estopped from the claims made in this action by virtue of their admission, through coverage counsel for the Hospital in a letter dated October 2, 2014, that the claims of Johnson, Oliver, Snell and Sommerville were "all first brought to the attention of PVHC during the OneBeacon Insurance year."   Patten knew of all material facts, and his knowledge as both an employee of HTMS and CEO of the Hospital is imputed to HTMS. Further, Patten, and therefore HTMS and the Hospital, in the application signed by Patten on June 19, 2014, failed to disclose information about claims or potential claims that was material to the acceptance by UMIA of the risk.  Had UMIA known of the material information, it would not have issued the UMIA Policy as it did.

**Fourth Affirmative Defense**

The Counterclaim is barred because the policy provides as follows:

**V.    GENERAL CONDITIONS**

\*\*\*

**Coverage A**

The insurance provided hereby only applies to **medical professional services** rendered or which should have been rendered on or after the **retroactive date** stated on the Declarations Page and then only if a **claim** is first made and reported during the **policy period** or a **reporting period** purchased in accordance with Section V.

\*\*\*

**For Coverage A and C only:**

A **claim** shall be considered to be "first made during the **policy period**" or "first made during a **reporting period**" only under the following conditions:

(a)     If, during the **policy period** or a **reporting period**, an **insured** shall first have knowledge or become aware of any event arising out of the rendering or failure to render **medical professional services** covered hereby which may subsequently give rise to a **claim** and shall, during the **policy period** or the **reporting period** give written notice thereof to UMIA in accordance with Section V. of this policy, then such notice shall be considered a **claim** hereunder.

(b)     If any **claim** is first made during the **policy period** or a **reporting period** that would be covered under this **Policy**, any additional **claims** which are made in connection therewith and are brought subsequent to the **policy period** or the **reporting period** shall be considered a part of the **claim** which was first made during the **policy period** or the **reporting period**.

A **claim** shall not be considered to be "first made during the **policy period**" or "first made during a **reporting period**" if any **insured** is aware, or reasonably should be aware, of the existence of a potential **claim** as of the date this **policy** is issued, regardless of whether or not such **claim** has yet been made or reported to any applicable liability insurer. For purposes of this Section, potential **claim** includes, without limitation, instances where any **insured** has received either an oral or written communication from a patient or the patient's legal representative, and/or a request by a patient or the patient's legal representative for copies of medical records under circumstances reasonably indicative of a potential **claim**.

Patten, an employee of HTMS and contract CEO of the Hospital, and other management personnel had actual notice of the existence of potential claims prior to the issuance of the UMIA Policy. Patten was an employee of HTMS and was the CEO of the Hospital which knowledge is imputed to both HTMS and the Hospital. The claims were not first made during the UMIA Policy period.

### Fifth Affirmative Defense

The Counterclaim is barred because under Coverage B, the claims arise from the provision of **medical professional services,** excluded pursuant to **COVERAGE B-HEALTHCARE SYSTEM GENERAL LIABILITY,** Exclusion (e).

### COUNTERCLAIM AGAINST HTMS AND PATTEN AND CROSSCLAIM AGAINST POWELL VALLEY HOSPITAL DISTRICT, POWELL VALLEY HEALTH CARE, INC., AND JEFFREY HANSEN, M.D.

For its Counterclaim against HTMS and Patten and Powell Valley Hospital District Powell Valley Health Care, Inc. (the Hospital) and Hansen, UMIA states as follows:

### I.   NATURE OF ACTION

1.       This action presents an insurance coverage dispute.  The parties seek declaratory relief regarding the duties of defense and indemnity, if any, of the insurer parties claimed by the insured parties to be owed as the result of claims made, and lawsuits filed, against the insured parties arising from allegations of medical malpractice against Defendant Hansen while employed by the Hospital.  Doc. 1; Doc. 22-1; Doc. 45.   HTMS and Patten also sue UMIA and Homeland for bad faith.  They claim that UMIA committed bad faith for denials of duties of defense and indemnity owed for claims brought by Stambaugh, Oliver, Sommerville, Snell, Johnson and DiPilla.  Doc. 22-1.  The Hospital and Hansen sue UMIA for bad faith arising from the denial of a claim made by DiPilla.  Doc. 45.

### II.   JURISDICTION AND VENUE

2.       Diversity jurisdiction is based upon 28 U.S.C. § 1331(a)(1) because there exists diversity of citizenship as set forth in that statute, and because the amount in controversy exceeds $75,000.

3.       The parties seek relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed.R.Civ. Pro. 57.

4.       There exists an actual justiciable controversy between UMIA on the one hand, and HTMS, Patten, the Hospital and Hansen on the other hand, regarding the relative rights and obligations of the parties under the terms of insurance an insurance contract.

5.       Venue is properly placed in the United States District Court for the District of Wyoming pursuant to 28 U.S.C. § 1391(a), as the insurance contract issued by UMIA that is the subject of this action was issued in this district; some of the parties to this action reside in this

district, and the transactions and events that are the subject of the claims raised by the parties occurred in this district.

## III.    FACTUAL ALLEGATIONS

6**.**    Prior to August 1, 2014, the Hospital, HTMS, Patten and Hansen were insured under the following policies:

- Lexington policies with policy periods of August 1, 2012 to August 1, 2013.

- Homeland Policy MPP-5514-13 with a policy period of August 1, 2013 to August 1, 2014.

7.    UMIA issued policy number WY920017, naming the Hospital as insured (the UMIA Policy).  A true and correct copy of the UMIA Policy is attached as Exhibit 2.

8.    HTMS is an insured by endorsement under the UMIA Policy.

9.    Patten is an insured by definition under the UMIA Policy.

10.    Hansen is an insured by definition under the UMIA Policy.

11.    Hansen is also named on a Departed Individuals Endorsement to the UMIA Policy.

12.    At times material to this action, Hansen was a physician employee of the Hospital.

13.    On or about November 1, 2010.  HTMS and the Hospital entered into an Agreement for Management Services.

14.    At all times material to this controversy, Patten was an employee of HTMS.

15.    Pursuant to the terms of the Agreement for Management Services, Patten was appointed as the CEO of the hospital.

16.    The Agreement for Management Services provides, among other things:

- HTMS would provide supervision and effective management of the day-to-day business operations of the hospital through the CEO

- HTMS would be certain that the Hospital has appropriate systems to coordinate Hospital policies rules and regulations with patient care, financial management and medical education

- HTMS would provide CEO-level oversight of the recruitment, hiring, promotion, discharge, supervision, disciplining and management of all employees, including employed physicians (not including employees' professional medical judgment or medical actions)

- HTMS would oversee that the Hospital had appropriate systems to coordinate, among other things, medical education

17.   The following actions have been commenced against the insureds:

- A lawsuit filed by Susan Stambaugh and Scott Stambaugh in Park County, Wyoming District Court, Civil Action No. 27758, against HealthTech and the Hospital (the "Stambaugh I Suit");

- A lawsuit filed by Susan Stambaugh and Scott Stambaugh in Park County, Wyoming District Court, Civil Action No. 27818, against Dr. Hansen and the Hospital (the "Stambaugh II Suit");

- A lawsuit filed by Michelle Oliver in the United States District Court for the District of Wyoming, Case No. 14-CV-168-S, against HealthTech, Patten, Dr. Hansen and Powell Valley Healthcare, Inc. (the "Oliver Suit");

- A lawsuit filed by Joetta Johnson in Park County, Wyoming District Court, Civil Action No. 27821, against HealthTech, Dr. Hansen and Powell Valley Healthcare, Inc., (the "Johnson Suit");

- A lawsuit filed by Lynn Snell and Janet Snell in Park County, Wyoming District Court, Civil Action No. 27805, against HealthTech, Patten, Dr. Hansen and Powell Valley Healthcare, Inc. (the "Snell Suit");

- A lawsuit filed by Veronica Sommerville and William Sommerville in Park County, Wyoming District Court, Civil Action No. 27813, against HealthTech, Dr. Hansen and Powell Valley Healthcare, Inc. (the "Sommerville Suit");

- A lawsuit filed by Martha McMillen and Richard McMillen in Park County, Wyoming District Court, Civil Action No. 27948, against HealthTech and Patten (the "McMillen Suit");

- A lawsuit filed by Jan Brinkerhoff and Bart Brinkerhoff in Park County, Wyoming District Court, Civil Action No. 279486, against HealthTech and Patten (the "Brinkerhoff Suit");

- Certain Notices of Governmental Claim and/or Applications for Claim Review filed with the Wyoming Medical Review Panel by former patients of the Hospital, whose identities are not set forth herein pursuant to the provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), alleging injuries suffered as a result of medical procedures performed by Dr. Hansen and further asserting allegations against the Hospital, HealthTech and/or Patten regarding the credentialing, hiring,

supervising, monitoring, reviewing, training, and extending privileges to Dr. Hansen; and

- Any other written notice received by the Defendants, including, but not limited to, Notices of Governmental Claim, Applications for Claim Review filed with the Wyoming Medical Review Panel or lawsuits by patients of the Hospital, alleging injuries suffered as a result of medical procedures performed by Dr. Hansen and further asserting allegations against the Hospital, HealthTech and/or Patten regarding the credentialing, hiring, supervising, monitoring, reviewing, training, and extending privileges to Dr. Hansen.

18.     In 2013, the Hospital was sued in the United States District Court for the District of Wyoming, case number 13-CV-216-S (the Durose Action).

19.     The Durose Action arose from alleged medical malpractice committed by Hansen, and was reported during the Lexington policy period.  In addition, another claim, the Harris claim, was reported during the Lexington policy period.

20.     In the Durose Action, the deposition of a former employee of the Hospital, Bradley Mangum, was taken on June 5, 2014, approximately two months prior to the inception of the UMIA Policy.

21.     Among other things, Mr. Mangum testified that:

- He maintained a journal of his personal, real-time observations of what he believed to be substandard medical care provided by Dr. Hansen to a number of patients, identified in his journal by initials

- Based upon his own observations of the medical procedures performed by Hansen, he was concerned about the type of surgeries being performed by Dr. Hansen

- He was concerned about the outcomes of the surgeries

- He was concerned with the infection rate

- He was concerned about surgical techniques of Hansen

- He was concerned about unnecessary surgeries being performed

- He reported his concerns to Dr. Nathaniel Rieb, who was chief of surgery at the Hospital.

- He reported his concerns to Patten

- He reported his concerns to Tim Seeley, the Risk Manager at the Hospital

- In March of 2014 he wrote a letter to the Hospital board regarding his concerns

- Dr. Lengfelder, a board member, asked Mangum to attend a board meeting to advise the Board of Trustees of the issues with patient care provided by Dr. Hansen

- Mangum reported his concerns to the Hospital board

22.     Despite believing that he had followed the Hospital chain of command in reporting concerns about Dr. Hansen's medical care, Mangum felt his job was placed in jeopardy as the result of his reporting.

23.     By letter dated October 29, 2013, from the Hospital's attorney, Christopher C. Voigt, the Hospital effectively attempted to silence Mangum from further comment about Dr. Hansen.

24.     Mangum testified that after a conversation with Patten in which he voiced concerns about Hansen's medical care, Patten disclaimed being "medical".

25.     In August of 2013, Mangum was told by Tim Seeley, the risk manager for the Hospital, that "we can't kill the goose that laid the golden egg until we get another goose."

26.     The Hospital and HTMS were thus attempting to conceal the fact that they were aware of the risk created by Hansen's medical practice, to disclaim responsibility therefor, and further to avoid taking any action to prevent injuries to patients and claims being made.

27.     Hansen had been suspended from work at the Hospital on or about November 27, 2013.

28.     By letter dated February 14, 2014, to Mangum, Patten, as CEO of the Hospital and an employee of HTMS, apologized for the October 29, 2013 letter, and said it should not have been sent.  Patten stated that he understood that Mangum was "only doing what [he] thought was right for [his] patients and for Powell Valley Healthcare (PVHC)."

29.     By another letter dated February 14, 2014, to Mangum, signed by Patten as CEO of the Hospital and by Mark Wurzel, M.D. as President of the Board of Trustees of the Hospital, the Hospital expressed its appreciation and recognition from the Board; recognized the "pivotal role" that Mangum played during the Professional Practice Evaluation Committee's review of Hansen's care; that the information Mangum provided lead to the Medical Executive Committee's suspension of Hansen's privileges; and that with Mangum's assistance, the Hospital had taken a big step toward assuring the safety of the Hospital's patients.

30.     By email dated July 31, 2014, Mel C. Orchard III, Esq., counsel to a number of parties claiming injury as the result of Dr. Hansen's medical care, sent an email to Scott Ortiz, the attorney defending the Hospital in the DuRose lawsuit, and notified Mr. Ortiz that Orchard

intended to file claims against Hansen, the Hospital and potentially others on behalf of Oliver, Sommerville, Johnson, and Snell.  Exhibit 3.

31.     By letter dated October 2, 2014, addressed to the procuring insurance agent for the OneBeacon (Homeland) policy, the insurance policy covering the policy period immediately preceding the inception of the UMIA Policy, the Hospital's attorney stated that the Johnson, Snell, Oliver and Sommerville claims were "all first brought to the attention of PVHC during the OneBeacon Insurance year."  Exhibit 4.

32.     In the complaint filed to commence an action on behalf of Susan Stambaugh, it is alleged that her damages were caused by, among other things, negligent hiring, supervision and retention on the part of HTMS.

33.     In the complaint filed to commence an action on behalf of Michelle Oliver, it is alleged that prior to her treatment on August 21, 2012, HTMS was aware that Dr. Hansen was not competent.

34.     In the administrative complaint filed on behalf of Veronica Sommerville and William Sommerville, it is alleged that as early as 2007, the Hospital was aware of complaints that Hansen was not competent.

35.     In the administrative complaint filed on behalf of Joetta Johnson, it is alleged that as early as 2007, the Hospital was aware that Hansen was not competent.

36.     The UMIA Policy provides:

I.               INSURING AGREEMENTS

COVERAGE A – HEALTHCARE SYSTEM MEDICAL PROFESSIONAL LIABILITY

UMIA agrees to pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as **damages** because of any claim or **claims** first made against and reported to the **insured** during the **policy**

**period** and occurring within the coverage territory arising out of the performance of **medical professional services** rendered or which should have been rendered on or after the retroactive date by the **insured** or by any person for whose acts or omissions the **insured** is legally responsible.

UMIA shall have the right and duty to defend any suit against the **insured** alleging such **damages**, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation or such settlement of any claim or suit at it's sole discretion, but UMIA shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of UMIA's liability hereunder has been exhausted by payment of judgments or settlements.

**Exclusions**:

Coverage A does not apply to:

(a)      liability arising from alleged violations of any "anti-trust" laws as defined in Section I of the Clayton Act, 15 U.S. Code Section 12, the Federal Trade Commission Act, or the laws of any jurisdiction relating to monopolization, restraint of trade, or unfair methods of competition;

(b)      **claims** against an **insured** by any other **insured** covered by the Policy, but this exclusion does not apply to employees who are being treated as patients by an **insured**;

(c)      liability assumed by an **insured** under any oral or written **contract** or agreement.  However this exclusion will not apply if the **insured** would have been liable without the **contract** or agreement;

(d)      any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of any **insured**.

**COVERAGE B-HEALTHCARE SYSTEM GENERAL LIABILITY**

UMIA agrees to pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as **damages** because of:

(a)      **Bodily injury** or property damage during the **policy period** caused by an occurrence;

(b)      **Advertising injury** or **personal injury** caused by an **offense** during the **policy period**; provided the occurrence takes place, or the **offense** is committed within the coverage territory.

UMIA shall have the right and duty to defend any suit against the **insured** alleging such **damages**, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation or such settlement of any claim or suit at its sole discretion, but UNIA shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of UMIA's liability hereunder has been exhausted by payment of judgments or settlements.

**Exclusions**:

Coverage B does not apply to:

(a)      **bodily injury** or property damage arising out of the ownership, entrustment, maintenance, operation, use, loading or unloading of any automobile or aircraft owned or operated by or rented, chartered or loaned to an **insured**, or any other automobile or aircraft operated by any person in the course of employment by an **insured**. However, this exclusion does not apply to the parking of an automobile on any premises owned, rented, leased or borrowed by the **insured**, or on ways next to such premises, if such automobile is not owned by or rented or loaned to an **insured**;

(b)      **bodily injury** or property damage arising out of:

(1)      the transportation of mobile equipment by an automobile owned ort operated by or rented or loaned to any **insured**;

(2)      the use of  mobile equipment in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity;

(c)      **bodily injury** or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft owned or operated by or rented to any **insured**, or any other watercraft operated by any person in the course of employment by an **insured**. However, this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by an **insured**, or any watercraft under 50 feet in length which is not owned by the **insured** nor used to carry person or property for a charge;

(d)      liability under any worker's compensation, employer's liability, disability benefits, unemployment compensation, or under any similar law. This includes **bodily injury** to an employee arising out of and in the course of his or her employment, as well as **bodily injury** to the spouse, child, parent, brother or sister of that employee as a consequence of the above injury. This exclusion will apply whether the **insured** may be held

22

liable as an employer or in any other capacity such as a property owner or product manufacturer. This exclusion will also apply to any obligation of the **insured** to share **damages** with or repay someone else who must pay **damages** because of **bodily injury** to any employee of the **insured**;

(e)     liability arising out of the performance of **medical professional services**;

(f)     liability assumed by an **insured** under any **contract** or agreement except a **contract** as defined in Section IV., Definitions;

(g)     any willful, fraudulent, dishonest, criminal or malicious act or omission, by or with the knowledge or consent of, or at the direction of any **insured**;

(h)     liability arising against an **insured** as the perpetrator of sexual conduct including, but not limited to, sexual abuse, deviant sexual behavior, sexual assault, molestation or sexual harassment;

(i)     **property damage** to:

(1)     property owned, occupied by or rented to an **insured**;

(2)     property used by an **insured**; or

(3)     property in the care, custody or control of an **insured** or property over which an **insured** is for any purpose exercising physical control;

(4)     premises an **insured** sells, gives away or abandons, if the property damage arises out of any part of those premises;

(j)     liability based upon the Employee Retirement Income Security Act of 1974 (also known as the Pension Reform Act of 1974), as amended in part by Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), and amendments to either, or similar provisions of any federal, state or local statutory law or common law;

(k)     **property damage** to **impaired property** or property that has not been physically injured, arising out of:

***

**DEFINITIONS**:

(d)     infringement of copyright, title or slogan.

23

"**Bodily injury**" means death, physical injury, sickness or disease sustained by a person.

"**Claim(s)**" means:

(a)      a demand for money **damages** to which this insurance applies, arising from an injury allegedly caused by the **insured**:

(b)      an act or omission which a reasonable person would believe will result in a demand for money **damages** to which this insurance applies.

"**Contract**" means any of the following agreements:

(a)      lease of premises;

(b)      sidetrack agreement;

(c)      elevator maintenance agreement;

(d)      easement agreement, including any license agreement in connection with vehicle or pedestrian private railroad grade crossings; or

(e)      promise to reimburse a municipality that is required by ordinance except in connection with **work** for the municipality; and

(f)      any other **contract** or agreement under which any **insured** assumes the tort liability of another party to pay for **injury** or **property damage** to a third person or organization if such **contract** is related to your business and is made before the **bodily injury** or property damage occurs. Tort liability means a liability that would be imposed by law in the absence of any **contract** or agreement.

"**Coverage territory**" means anywhere in the world with respect to **damages** because of **bodily injury**, property damage, **advertising injury** or **personal injury**, provided the original suit for such **damages** is brought within the United States of America. Coverage provided by this policy applies to **medical professional services** rendered or which should have been rendered anywhere in the world provided that the suit or **claim** is first brought in the United States.

"**Damages**" means all amounts of money which are payable to compensate for loss because of injury to which this insurance applies.

"**Electronic data**" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS,

tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

"**Employee benefits program**" means pensions and profit sharing plans; individual retirement account (IRA) plans; salary reduction plans under Internal Revenue Code 401(k) or amendments; employee stock subscription plans; savings plans; group plans for life, health, dental, disability, automobile, homeowners, and legal advice insurance; social security system benefit; worker's compensation and unemployment insurance; travel and vacation plans and educational reimbursement plans.

"**Formal Review Board or Committee**" means any **formal review board** or **committee** of the **named insured** while performing the following activities:

(a)     evaluating the professional qualifications or clinical performance of any provider or **medical professional services**; or

(b)     promoting and maintaining the quality of **medical professional services** being provided.

"**Hazardous properties**" means radioactive, toxic or explosive properties.

"**Hostile fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be.

"**Impaired property**" means tangible property, other than the **named insured's products** or named **insured's** work, that cannot be used or is less useful because:

(a)     it incorporates the **named insured's products** or **named insured's work**, that is known or thought to be defective, deficient, inadequate or dangerous; or

(b)     the **insured** failed to fulfill the terms of the **contract** or agreement;

if such property can be restored to use by:

(a)     the repair, replacement, adjustment or removal of the **named insured's products** or **named insured's work**; or

(b)     the insured fulfilling the terms of the **contract** or agreement.

"**Insured**" means the following:

(a)     the **named insured**;

(b)     any organization of the **named insured** newly acquires or forms, other than a partnership or joint venture, and over which the **named insured** maintains ownership and majority interest, provided there is no similar insurance available to the organization. However:

(1)     coverage under this provision is afforded only until the 90th day after the new organization is acquired or formed or the end of the **policy period**, whichever is earlier;

(2)     coverage does not apply to **bodily injury** or property damage, or **personal injury** or **advertising injury**, that occurs prior to the acquisition or formation of such organization;

(c)     if the **named insured** is designated on the Declarations Page as:

(1)     a partnership or joint venture, that organization is covered. Individual partners or members including spouses of such are also **insureds**, but only while acting within the scope of their duties.

(2)     an organization other than a partnership or joint venture, that organization is covered. Executive officers, stockholders, trustees and directors are also **insureds**, but only while acting within the scope of their duties.

(d)     Each of the following is also an **insured**:

(1)     hospital administrators, members of the Board of Governors, members of the Board of Directors, employees or volunteer workers, but only while acting within the scope of their duties.

However, coverage afforded for employees does not apply to:

(a)     interns, externs, residents and dental, osteopathic, chiropractic, podiatrist or medical doctors unless specifically endorsed onto this Policy;

(b)     **bodily injury** or **personal injury** to an **insured** or to a co-employee while in the course of employment or to the spouse, child, parent, brother or sister of such co-employee as a consequence of such **bodily injury** or **personal injury**, or for any obligation to share **damages** with or repay someone else who must pay **damages** because of the injury; or

(c)     **property damage** to property owned or occupied by or rented or loaned to the employee, any other employee or any partner or member of the **named insured**.

26

(2)     members of any formal accreditation, **formal review board or committee**, or similar board or committee or persons charged with the duty of executing directives of any board or committee of the **named insured** while acting within the scope of their duties;

(3)     any person enrolled as a student in a training program within the **named insured** facility, but only for liability arising out of the performance of, or failure to perform duties relating to such training program;

(4)     any person (other than an employee of the **named insured**) or organization wile acting as real estate manager for the **named insured**;

(5)     medical directors, but only for administrative duties performed on behalf of the **named insured**.

However, no person or organization is an **insured** with respect to the conduct of any current or past partnership or joint venture that is not listed as a **named insured** in the Declarations.

The insurance afforded applies separately to each **insured** against whom a claim is made or suit is brought except with respect to the limits of UMIA's liability as set forth in Section II.

"**Insured's products**" means goods or products manufactured, sold, handled or distributed by the **insured** or by others trading under its name, including any container thereof (other than a vehicle) and the providing of or failure to provide warnings or instructions. An **insured's products** shall not include a vending machine or any property other than such container, rented to or located for use of others.

"**Medical professional services**" means only the following:

(a)     medical, surgical, dental, X-ray, nursing, mental health or other similar professional health care services or treatments relating to the practice of medicine provided in the operation of your health care facility;

(b)     furnishing of food and beverages in connection with providing **medical professional services**;

(c)     dispensing of drugs, medical or dental supplies and appliances;

(d)     performing post-mortem procedures, including autopsies or harvesting of organs;

27

(e)      evaluating, or responding to an evaluation of, the professional qualifications or performance of any provider of health care professional services, when done by or for any of the **insured's formal review boards or committees**;

(f)      communicating, or failing to communicate, any information to any of the **insured's formal review boards or committees**; or

(g)      carrying out, or failing to carry out, any decision or directive of any of the **insured's formal review boards or committees**.

"**Mobile equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:
(a)      forklifts, snow removal equipment, lighting and well servicing equipment, street cleaning and road maintenance, air compressors, pumps, generators, welding, spraying, building cleaning equipment; and

(b)      vehicles maintained for use solely on the premises owned or rented by the **insured** and other vehicles designed for use principally off public roads.

"**Named insured**" means the person(s) or organizations designated as the **named insured** on the Declarations Page of this policy.

"**Named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under its name, including any container thereof (other than a vehicle) and the providing of or failure to provide warnings or instructions. A **named insured's products** shall not include a vending machine or any property other than such container, rented to or located for use of others.

"**Nuclear facility**" means any:

\*\*\*
(b)      For the purposes of this insurance, electronic data is not tangible property.

"**Reporting period**" means the period of time stated in the reporting endorsement for the reporting **claims**. Coverage is limited to **claims** reported to UMIA during the reporting period arising from:

(a)      under Coverage A, **medical professional services** rendered or which should have been rendered subsequent to the **retroactive date** and prior to the end of the **policy period**;

(b)      under Coverage C, "wrongful acts" which occur prior to the end of the **policy period**.

"**Retroactive date**" is the date listed on the Declarations Page which is the first date that coverage applies to any **medical professional services** covered under this Policy.

"**Spent fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

"**Waste**" means any waste material containing by-product material, or resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b). Waste includes materials to be recycled, reconditioned or reclaimed.

"**Work**" means operations performed by an **insured** or on its behalf and materials, parts or equipment furnished in connection with such operations including warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of work and the providing of or failure to provide warnings or instructions.

## V.      GENERAL CONDITIONS

**Premium**

All premiums for this Policy shall be computed in accordance with UMIAS's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

**Policy Period**

### Coverage A

The insurance provided hereby only applies to **medical professional services** rendered or which should have been rendered on or after the **retroactive date** stated on the Declarations Page and then only if a claim is first made and reported during the **policy period** or a reporting period purchased in accordance with Section V.

### Coverage B

The insurance provided hereby only applies to **claims** arising from the administration of the named **insured's** employee benefits program on or after the **retroactive date** stated on the Declarations Page and then only if a **claim** is first made and reported during the **policy period** or **reporting period** purchased in accordance with Section V.

**Insured's Duties in the Event of an Occurrence, Claim or Suit**

(a)      Upon an **insured** obtaining knowledge or becoming aware of any alleged injury which may subsequently give rise to a claim, notice shall be given by or for the **insured** to UMIA or any of its authorized representatives as soon as practicable. If further information is required by UMIA to investigate or defend such claim, the **insured** shall provide all such information available promptly.

(b)      If **claim** is made or suit is brought against an **insured**, the **insured** shall immediately forward to UMIA every demand, notice, summons or other process received by the **insured** or the **insured's** representative.

(c)      The **insured** shall cooperate with UMIA and, upon UMIA's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution against any person or organization who may be liable to the **insured** because of injury or **damages** with respect to which insurance is afforded under this Policy; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at the **insured's** own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.

A **claim** shall be considered to be first made when UMIA first receives notice of the **claim** or of an event which may subsequently give rise to a **claim**.

**For Coverage A and C only**:

A **claim** shall be considered to be "first made during the **policy period**" or "first made during a reporting period" only under the following conditions:

(a)      If, during the **policy period** or a **reporting period**, an **insured** shall first have knowledge or become aware of any event arising out of the rendering or failure to render **medical professional services** covered hereby which may subsequently give rise to a **claim** and shall, during the **policy period** or the **reporting period** give written notice thereof to UMIA in accordance with Section V. of this policy, then such notice shall be considered a **claim** hereunder.

(b)      If any **claim** is first made during the **policy period** or a **reporting period** that would be covered under this Policy, any additional **claims** which are made in connection therewith and are brought subsequent to the

**policy period** or the **reporting period** shall be considered a part of the **claim** which was first made during the **policy period** or the reporting period.

A **claim** shall not be considered to be "first made during the **policy period**" or "first made during a **reporting period**" if any **insured** is aware, or reasonably should be aware, of the existence of a potential claim as of the date of this policy as issued, regardless of whether or not such claim has yet been made or reported to any applicable liability insurer. For purposes of this Section, potential **claim** incudes, without limitation, instances where any **insured** has received either an oral or written communication from a patient or the patient's legal representative, and/or a request by a patient or the patient's legal representative for copies of medical records under circumstances reasonably indicative of a potential claim.

## Reporting Endorsement

Under Coverages A and C, in the event of termination of insurance either by non-renewal or cancellation (except for cancellation due to non-payment of premium) of this **Policy**, the named **insured** shall have the right upon the payment of additional premium (to be computed in accordance with UMIA's rules, rates, rating plans and premiums applicable on the effective date of the reporting endorsement) to have issued an Endorsement providing additional **reporting period(s)** in which **claims** otherwise covered by this Policy, under Coverages A, and C, may be reported.

Such right hereunder must, however, be exercised by the first **named insured** by written notice not later than thirty (30) days after such termination date. Such reporting endorsement may not be cancelled by UMIA except for non-payment of premium.

## Action Against UMIA

No action shall lie against UMIA unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, not until the amount of an **insured's** obligation to pay shall have been finally determined either by final judgment after expiration of period for appeal against such **insured** after actual trial or by written agreement of the **insured**, the Claimant and UMIA. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under the Policy to the extent of the insurance afforded by this Policy.

37.     UMIA has denied claims made by Stambaugh, Oliver, Sommerville, Snell and Johnson and DiPilla.

38.     UMIA is defending or contributing to the defense of claims made by Bates, Bonamarte, Brinkerhoff, Crawford, Eller, Henderson, Knopp, McMillen, Meier, Nicholson, Noh, Redland, Ronne, Scott, Sessions and Werbelow under full reservation of rights.

39.     Under the terms and conditions of the UMIA Policy, Coverage A, there is no coverage for any of the referenced claims because the claims were not first made during the UMIA Policy period.

40.     Under the terms and conditions of the UMIA Policy, Coverage B, there is no coverage for any of the referenced claims because the claims arise from excluded conduct.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF-DECLARATORY JUDGMENT

41.     UMIA incorporates the foregoing allegations contained in paragraphs 1-39 as if set forth verbatim.

42.     UMIA seeks a declaratory judgment that it has no duty to defend or indemnify the Hospital, HTMS, Patten or Hansen for any of the claims of the parties referenced above because those parties were aware, or reasonably should have been aware, of the existence of potential claims as of August 1, 2014, the inception date of the UMIA Policy.

43.     The circumstances by which such insureds were or should have been aware of potential claims, all of which occurred prior to the inception of the UMIA Policy include, but are not necessarily limited to:

A.     The reporting by Bradley Mangum

B.     The deposition of Bradley Mangum taken during the DuRose action

      C.      Actual knowledge of Bill Patten, Tim Seeley, the Board of Trustees and other responsible, managing hospital personnel of the extensive problems with practices of Dr. Hansen

      D.      Requests for medical records made by DiPilla and possibly others

      E.      Administrative proceedings commenced by claimants

      F.      Allegations that the Hospital knew of problems with Dr. Hansen as early as 2007.

44.      Further, there is no duty to defend or indemnify HTMS, the Hospital, Patten or Hansen because the claims are subject to the exclusionary language set forth above for coverages A and B.

## SECOND CLAIM FOR RELIEF-RESCISSION

45.      UMIA incorporates the foregoing allegations contained in paragraphs 1-43 as if set forth verbatim.

46.      On or about June 19, 2014, Patten completed an application to Homeland for a new policy for the period August 1, 2014 to August 1, 2015.

47.      That application was then submitted to UMIA for a new policy for the period August 1, 2014-August 1, 2015.

48.      The Hospital, HTMS and Patten failed to disclose material information detailed above regarding risks and claims arising from the medical care provided by Dr. Hansen.

49.      Prospective insureds owe a duty to prospective insurers to provide and disclose all information material to the risk for which insurance is sought.

50.    In the absence of full disclosure by the prospective insureds, an insurer in the position of UMIA is not able to properly evaluate whether the risk is one the insurer will insure; under what terms and conditions the risk might be insured, and what premium must be charged.

51.    HTMS, Patten, the Hospital and Hansen failed to disclose material information to UMIA at the time of application for the UMIA Policy, signed by Patten.

52.    The knowledge and actions of Patten in applying for insurance are imputed to the Hospital, HTMS and Hansen.

53.    The UMIA Policy provides as follows:

**Declarations and Applications**

By acceptance of this Policy, the **Named Insured** agrees that the statements on eh Declarations Page and applications are its agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this Policy embodies all agreements existing between the **Named insured band UIA** or any of its agents relating to this insurance.

54.    Had UMIA known the true facts as required by the application for the policy, it would have had the opportunity to decide to (1) not issue the UMIA Policy; or (2) issue the UMIA Policy but at a different premium rate; or (3) to issue the UMIA Policy but exclude the risk known to the Hospital, HTMS and all insureds under that policy, specifically, the risk of claims arising from the conduct of Dr. Hansen; or (4) otherwise avoid insuring the risk.

55.    Pursuant to Wyo.Stat.Ann. 26-15-109, UMIA is entitled to rescission of the UMIA Policy.

56.    UMIA seeks a declaration that it is entitled to rescission of the UMIA Policy.

**WHEREFORE** UMIA respectfully seeks a declaratory judgment that:

A.    It owes no duty of defense or indemnity on any of the claims described above.

B.    It is entitled to rescission of the UMIA Policy;

      C.      UMIA further seeks any other relief that is proper under the circumstances, including costs and attorney fees.

      Respectfully submitted,

                          *s/ Jon F. Sands*
                          Jon F. Sands
                          Sweetbaum Sands Anderson PC
                          1125 Seventeenth Street, Suite 2100
                          Denver, Colorado 80202
                          Phone:  (303) 296-3377
                          Admitted *Pro Hac Vice*
                          jsands@sweetbaumsands.com

                          Julie Nye Tiedeken
                          Wyoming Bar #5-1949
                          McKellar, Tiedeken & Scoggin, LLC
                          P.O. Box 748
                          Cheyenne, WY 82003-0748
                          307.637.5575
                          307.637.5515
                          jtiedeken@mtslegal.net

                          ATTORNEYS FOR DEFENDANT UMIA
                          INSURANCE, INC.

## CERTIFICATE OF SERVICE

      I hereby certify that on November 13, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

| *Attorneys for Plaintiff Homeland Insurance Company of New York:* | *Attorneys for Defendant Powell Hospital District and Powell Valley Healthcare:* |
|---|---|
| Judith Studer, Esq. (5-2174) | Tracy J. Copenhaver, Esq. |
| Schwartz, Bon, Walker & Studer, LLC | Copenhaver, Kath, Kitchen Kolpitcke, LLC |
| 141 South Center Street, Suite 500 | 224 N. Clark Street |
| Casper, WY 82601 | P. O. Box 839 |
| Phone: (307) 234-5099 | Powell, WY 82435 |
| Email: jstuder@schwartzbon.com | Phone: (307) 754-2276 |
| | Email: tracy@ckattorneys.net |
| Charles E. Spevacek, Esq. (admitted pro hac vice) | |
| Tiffany M. Brown, Esq. (admitted pro hac vice) | |
| Meagher & Geer, PLLP | |
| 33 South Sixth Street, Suite 4400 | |
| Minneapolis, MN 55402 | |
| Phone: (612) 338-0661 | |

| | |
|---|---|
| Email: cspevacek@meagher.com<br>tbrown@meagher.com | |
| **Attorneys for Defendants**<br>**HealthTech Management Services, Inc.**<br>**and William D. Patten:**<br>Joanna R. Vilos, Esq. (6-4006)<br>Holland & Hart LLP<br>P. O. Box 1347<br>Cheyenne, WY 82003-1347<br>Phone: (307) 778-4200<br>Email: jvilos@hollandhart.com<br><br>Jose A. Ramirez, Esq. (admitted *pro hac vice*)<br>Holland & Hart LLP<br>8390 E. Crescent Parkway, Suite 400<br>Greenwood Village, CO 80111<br>Phone: (303) 290-1600<br>Email: jramirez@hollandhart.com | **Attorneys for Lexington Insurance Company:**<br>R. Jeff Carlisle, Esq. (California State Bar 76009)<br>Catherine A. Naltsas, Esq. (California State Bar 262259)<br>Farah Naz A. Namvar, Esq. (California State Bar 291765)<br>LYNBERG & WATKINS, APC<br>888 South Figueroa Street, 16th Floor<br>Los Angeles, California 90012<br>T: 213-624-8700<br>F: 213-892-2763<br>jcarlisle@lynberg.com<br>cnaltsas@lynberg.com<br>fnamvar@lynberg.com<br><br>Deborah M. Kellam | Special Counsel<br>HALL & EVANS, LLC<br>2015 Central Avenue, Suite C<br>Cheyenne, Wyoming 82001<br>T: 307-514-2567<br>F: 307-514-2568<br>kellamd@hallevans.com |

*s/ Jon F. Sands*
Jon F. Sands, No. 10680
Sweetbaum Sands Anderson PC
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Phone:  (303) 296-3377
Fax:  (303) 296-7343
jsands@sweetbaumsands.com

Julie Nye Tiedeken
Wyoming Bar #5-1949
McKellar, Tiedeken & Scoggin, LLC
P.O. Box 748
Cheyenne, WY 82003-0748
307.637.5575
307.637.5515
jtiedeken@mtslegal.net

Attorneys for Defendant UMIA Insurance, Inc.