1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3   HOMELAND INSURANCE COMPANY OF          Case No. 15-CV-00031-J
    NEW YORK,
4                                          Cheyenne, Wyoming
              Plaintiff,                   January 14, 2016
5        vs.                               9:41 a.m.

6   POWELL VALLEY HOSPITAL DISTRICT,
    POWELL VALLEY HEALTHCARE, INC.,
7   HEALTHTECH MANAGEMENT SERVICES,
    INC., JEFFREY HANSEN, M.D., and
8   WILLIAM D. PATTEN,

9            Defendants,
    AND
10
    HEALTHTECH MANAGEMENT SERVICES,
11  INC., and WILLIAM D. PATTEN,

12           Counterclaimants,
       vs.
13
    UMIA INSURANCE, INC., and
14  LEXINGTON INSURANCE COMPANY,

15           Counterclaim-Defendants,
    AND
16
    POWELL VALLEY HOSPITAL DISTRICT,
17  POWELL VALLEY HEALTHCARE, INC.,
    and JEFFREY HANSEN, M.D.,
18
             Cross-Claimants,
19     vs.

20  UMIA INSURANCE, INC., and
    LEXINGTON INSURANCE COMPANY,
21
             Crossclaim-Defendants.
22

23         **TRANSCRIPT OF INITIAL PRETRIAL CONFERENCE**

24          BEFORE THE HONORABLE ALAN B. JOHNSON
                UNITED STATES DISTRICT JUDGE
25

    Proceedings recorded by mechanical stenography;
    transcript produced by computer.

```
 1   APPEARANCES:

 2   For the Plaintiff:      MS. JUDITH A. STUDER
                             SCHWARTZ, BON, WALKER & STUDER, LLC
 3                           141 S. Center St., Suite 505
                             Casper, WY 82601
 4
                             MR. CHARLES E. SPEVACEK
 5                           MEAGHER & GEER, PLLP
                             33 South Sixth Street, Suite 4400
 6                           Minneapolis, MN 55402

 7   For the Defendants/     MR. TRACY J. COPENHAVER
     Cross-Claimants         COPENHAVER KATH KITCHEN & KOLPITCKE
 8   Powell and Hansen:      P.O. Box 839
                             Powell, WY 82435-0839
 9
     For the Defendants/     MS. JOANNA R. VILOS
10   Counterclaimants        HOLLAND & HART
     HealthTech and Patten:  P.O. Box 1347
11                           Cheyenne, WY 82003-1347

12                           MR. JOSE A. RAMIREZ
                             HOLLAND & HART, LLP
13                           6380 S. Fiddler's Green Cl., Ste. 500
                             Greenwood Village, CO  80111
14
     For the Counterclaim    MS. DEBORAH G. KELLAM
15   Crossclaim-Defendants   HALL & EVANS, LLC
     Lexington:              2015 Central Avenue, Suite C
16                           Cheyenne, WY  82001

17                           MS. CATHERINE A. NALTSAS
                             LYNBERG & WATKINS
18                           1150 Olive Street, Suite 1800
                             Los Angeles, CA  90015
19
     For the Counterclaim    MS. JULIE NYE TIEDEKEN
20   Crossclaim-Defendants   McKELLAR, TIEDEKEN & SCOGGIN
     UMIA:                   702 Randall Avenue
21                           Cheyenne, WY  82001

22                           MR. JON F. SANDS
                             SWEETBAUM SANDS ANDERSON, PC
23                           1125 17th Street, Suite 2100
                             Denver, CO  80202
24
     Court Reporter:         MS. JULIE H. THOMAS, RMR, CRR
25                           910 19th Street, Rm. A256
                             Denver, CO 80294       CA CSR No. 9162
```

1        (Proceedings commenced 9:41 a.m.,

2        January 14, 2016.)

3              THE COURT:  Good morning, everyone.

4              COUNSEL:  Good morning, Your Honor.

5              THE COURT:  Welcome, and please be seated.

6              Well, Miss Studer, it's at your invitation that we're

7     all here today.  I don't know whether to thank you or to throw

8     something at you.  But it's good to note that excellent

9     counsel are trying to sort all this out and are hard at work

10    in connection with this matter.

11             Tell me where you are presently.

12             MS. STUDER:  Your Honor, I'd like to introduce

13    Mr. Chuck Spevacek, if I said his name correctly, to the Court

14    and --

15             THE COURT:  Pronounced Spevacek?

16             MR. SPEVACEK:  I say it Spevacek, Your Honor.

17             MS. STUDER:  Spevacek.  See.  And I think he'll take

18    the lead, Your Honor.

19             MR. SPEVACEK:  Thank you.

20             Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. SPEVACEK:  Thank you for the courtesy of allowing

23    me to appear in your court.  We've had our scheduling

24    conference, our Rule 26(f) conference.  The parties worked

25    very cooperatively, and I think we've produced a fairly

 1  detailed joint report of our meeting.

 2          THE COURT:  Whoever took responsibility for that,

 3  thank you.

 4          MR. SPEVACEK:  Since we're isolated here on the

 5  plaintiff's side of the table, Your Honor, we'll take credit

 6  for doing most of the work on it.

 7          THE COURT:  All right.

 8          MR. SPEVACEK:  I think the only thing that's at issue

 9  is whether the Court is inclined to phase discovery between

10  the substantive issues of whether there's insurance coverage

11  or not, whether a policy should be rescinded, and the

12  counterclaims that have been made by the policyholders that

13  the denial of coverage or the assertion of grounds for a

14  decision were made in bad faith or not.

15          THE COURT:  All right.  Another complication I see in

16  the timing of this case is the likelihood that there will be

17  additional parties coming in as these cases settle.  And there

18  are 22 of them, if I counted correctly, and there are about

19  three of them that are in the process of settling by the

20  Hospital presently.  Maybe I need a report on what's going on

21  there.

22          MR. COPENHAVER:  Your Honor, it's Tracy Copenhaver,

23  counsel for the Hospital.  We are still in the process of

24  negotiating that.  At this point it looks like one is fairly

25  certain.

1            THE COURT:  Is this Stambaugh?

2            MR. COPENHAVER:  Correct.  And I'm still -- thought I

3     would know by today, but I don't, on the Wilson matter.  As

4     far as the other four, I -- I couldn't tell you whether that's

5     going to happen or not.

6            THE COURT:  How do you -- looking ahead in this

7     matter, what do you see happening as those cases are resolved

8     or settlement is achieved?

9            MR. COPENHAVER:  Uh, well, it is likely that there

10    will be a partial assignment of our claim against the insurers

11    for refusing to cover those claims to those individual

12    plaintiffs.  So to the extent they refused to cover the

13    Stambaugh claim, and we believe that's in bad faith, those

14    claims will be assigned to the Stambaughs, and I believe they

15    will become the real party in interest.

16           THE COURT:  And they'll be seeking consent to

17    intervene?

18           MR. COPENHAVER:  Yes, they will.  I mean, I think

19    that they will have the legal right to pursue that claim

20    because they'll own it at that point.  We won't have that

21    right any longer.

22           MR. SPEVACEK:  Legally, Your Honor, it really won't

23    have much impact on the case.  When the original case was

24    pled, it was determined there wasn't a need to join all the

25    pending claimants, and they're not joined.  So to the extent

```
 1   that they were to settle with any of the policyholders and

 2   take an assignment of the policyholders' rights, they would

 3   just step into the position the policyholder was in in the

 4   context of where we are in the litigation.  So there might be

 5   a change of counsel and there might even be a change of name

 6   in the case caption if you substitute the name of the claimant

 7   for the Hospital as the real party in interest as to that

 8   particular claim, but all the policy defenses, all the factual

 9   issues, everything else, are going to remain the same.  They

10   possess no independent claim that would be new to the case

11   just because they were brought in because they settled.  They

12   would simply be standing in the shoes of whichever

13   policyholder they settled with by way of the assignment.  So

14   it would be a change of faces, but it wouldn't change the

15   makeup of the litigation any.

16            THE COURT:  And so you would consider them to be

17   bound by any discovery that may have occurred up to that point

18   and --

19            MR. SPEVACEK:  They would have to be, Your Honor.

20            THE COURT:  All right.  Miss Kellam, who do you wish

21   to introduce today?

22            MS. KELLAM:  Thank you, Your Honor.  I'd like to

23   introduce Catherine Naltsas from California.  She and I both

24   represent Lexington.

25            THE COURT:  All right.
```

 1          MS. NALTSAS:  Good morning, Your Honor.

 2          THE COURT:  Welcome.

 3          MS. NALTSAS:  Thank you.

 4          THE COURT:  How does Lexington view its position in

 5  this case?

 6          MS. NALTSAS:  We are a crossclaim/counterclaim

 7  defendant and, um, we've answered the crossclaim and

 8  counterclaim at this time.  We don't see that there's any

 9  coverage for the claims under our policy, and I think that

10  will be borne out throughout discovery.

11          THE COURT:  Very well.  Thank you.

12          Mr. Copenhaver.

13          MR. COPENHAVER:  Yes, Your Honor.

14          THE COURT:  You are representing the Powell

15  interests.

16          MR. COPENHAVER:  Yes, as well as Dr. Hansen, who was

17  insured under the same policy as an employed physician with

18  Powell Valley Healthcare.  So -- and it's our position that

19  the hospital purchased insurance for every minute of every day

20  that it's been in existence for years, and that there's been

21  no gap in coverage, and that we properly tendered claims, and

22  that it's been wrongfully denied.  You know, our position is

23  the volume of claims has resulted in these decisions to not

24  provide coverage, that the policy language themselves extend

25  coverage, and that the denial is wrongful, and that we're

1   entitled to coverage, attorney fees, and damages for the

2   refusal to cover.

3            There has now been asserted by UMIA a claim that they

4   are entitled to rescind our contract, which we understand to

5   be just the -- for the policy year from August 1, 2014 to

6   August 1, 2015.  I hopefully would ask that they clarify that.

7   I think that's been the understanding, but, um, there are

8   numerous claims brought during that claim year, and rescission

9   affects not just the doctor that really is at the heart of

10  this matter, but rescission would affect every doctor, every

11  nurse, everybody for that entire year that provided service to

12  all the patients.  And they're seeking to rescind that

13  coverage, and we believe that is wrongful as well.  And we

14  intend to seek damages and attorney fees.

15           THE COURT:  Very well.

16           Miss Vilos.

17           MS. VILOS:  Good morning, Your Honor.

18           THE COURT:  Good morning.

19           MS. VILOS:  This is Joe Ramirez from our Denver

20  office of Holland & Hart, and we represent HealthTech

21  Management Services along with Bill Patten, who is the former

22  CEO of the Powell Valley Hospital.  And I am going to defer to

23  Joe, because he is taking the lead on this case, to express

24  our position.

25           THE COURT:  Good morning, Mr. Ramirez.

```
 1            MR. RAMIREZ:  Good morning, Your Honor.  How are you?
 2            We share the very same view; we are fully aligned
 3    with the hospital and Mr. Copenhaver.  Although we are
 4    technically not the named insured on the policy, I think there
 5    is an argument that by definition in the -- in the One Beacon
 6    policy, the Homeland policy, that we would qualify as an
 7    insured based on the allegations that the plaintiffs are
 8    making in the underlying cases.  So to the extent One Beacon
 9    believes that the coverage is limited to just to the
10    additional insured endorsement, we vehemently disagree.  We
11    think we have full rights as an insured under that policy, and
12    we intend to prove that during this proceeding.
13            THE COURT:  Very well.
14            Miss Tiedeken.
15            MS. TIEDEKEN:  Your Honor, I'd like to introduce Jon
16    Sands to the Court.  He is from Denver, and he and I are
17    representing UMIA, and I'll let him express our position.
18            MR. SANDS:  Good morning, Your Honor.
19            THE COURT:  Good morning.
20            MR. SANDS:  Thank you.  I echo Mr. Spevacek's
21    appreciation for letting us appear here.
22            Our position is that, number one, there are policy
23    defenses because of specific issues.  These are claims-made
24    policies, and there are certainly issues as to whether certain
25    claims were first reported, first made during the policy
```

1   period.  So there are policy defenses.  We are also seeking

2   rescission of that policy period, and yes, right now it is the

3   2014 to 2015 policy period under the Wyoming Statute that I

4   think -- I'll say governs rescission claims.  So we think the

5   denial of coverage -- denials of coverage that we have made

6   are entirely appropriate based on the policy language and the

7   facts leading up to what went on here.  Of course, I'm not

8   going to get into all the evidence, and I assume the Court

9   doesn't want me to do that, but, uh -- so that's really where

10  we are.

11          UMIA is participating in the defense of some of the

12  claims.  So I think we all have this issue that there are some

13  claims that have been denied outright, there are some that are

14  being defended under reservation of rights, so they're not all

15  the same.  And I think we've counted something like 21

16  lawsuits that are -- that are out there pending, and so we're

17  going to have to sort through those, the claims that have

18  actually been made to the various carriers, and figure out

19  whether we're dealing with policy defenses, rescission.

20          And then this bad faith piece is very important,

21  obviously, and that's -- those are the cases that can take a

22  lot of time and expense and expert evidence and things like

23  that.  And so at some point -- and I echo, again,

24  Mr. Spevacek's comments that one of the things we're going to

25  be discussing or asking the Court if we can discuss, rather,

1   is this kind of bifurcated process.  And Mr. Copenhaver and I

2   have had some lengthy discussions about mechanically how that

3   might happen, but that is an issue here because I think there

4   hopefully would be a way to get to the coverage piece before

5   we would get to the tort piece, that is, the bad faith piece.

6             THE COURT:  I anticipate motions.

7             MR. SPEVACEK:  Yes, Your Honor.  In fact, we

8   specifically wrote the joint meeting report as indicating the

9   desire to not put any restrictions on us, other than those

10  already contained -- that might be contained within Rule 56,

11  on being able to make motions.  Because this is a big and

12  complex case, and we think that it would be advantageous if

13  there are certain parts of it that we think we can dispose of

14  right away on dispositive motion, we all shouldn't have to

15  wait for eight months of discovery before we can bring a

16  dispositive motion to have something taken care of.  And if

17  someone opposing the motion thinks that there's discovery that

18  needs to be done in order for them to oppose the motion,

19  Rule 56 already provides the vehicle for dealing with that, so

20  we didn't feel like rewriting the federal rules in our joint

21  report.

22            So there will definitely be dispositive motions.  I

23  ultimately think at the end of the day after discovery is

24  completed the entire claim will be resolved on the basis of

25  dispositive motions, but there are some that we believe we can

1   bring earlier than others.  And the more early dispositive

2   motions we bring on discrete claims or discrete issues, the

3   more we streamline the litigation for all of us and for the

4   Court.

5           THE COURT:  I would hope that that would occur.  It

6   just seems to make good sense to tee up those issues as

7   quickly as they can be presented to the Court and --

8           MR. SPEVACEK:  In fact, we have one in mind already,

9   Your Honor, we think we can bring relatively quickly.

10          THE COURT:  All right.  And then if a motion under

11  56(f) is necessary to do some discrete discovery, it can be --

12  can be done, and that makes good sense.

13          MR. SPEVACEK:  Your Honor, the other thing I would

14  point out from Homeland's standpoint, just so the Court is

15  aware, we too are defending the Powell entities against some

16  of the cases under a reservation of rights.  There are some

17  claims against the Powell entities that we have denied.  It

18  all has to do on when the claims were made.  Our position, as

19  set forth in the pleadings, is that we think these are all

20  related claims and they relate back to a claim that was made

21  before our policy period incepted.  If they're not related

22  claims, well, then they still have to be made within our

23  policy period, and there were some claims against the Powell

24  entities that were made after the expiration of our policy

25  into the time period of Mr. Sands' client's policies.  So with

1   regard to the Powell entities, we are defending under a

2   reservation of rights the claims that were made during our

3   policy period.

4          We have all the same defenses as to the HealthTech

5   entities that we do as to the Powell entities, but we have an

6   additional defense, we think, based on their status as an

7   insured, and we're not defending any of the claims against the

8   HealthTech entities.

9          THE COURT:  Very well.

10         The parties have told the Court that this matter is

11  one that they feel is complex.  I think I agree.  The number

12  of parties that are involved potentially in this case, as well

13  as those who are before the Court, would seem to signal

14  complexity.  The fact that we're talking about phased -- the

15  possibility of phased discovery or some control -- continuing

16  control by the Court over the discovery process signals

17  complexity in this case.  So I'm not -- am not prepared to

18  argue with anyone as to the decision of counsel that this is

19  complex and that additional time may be required to prepare

20  it.

21         It seems to me that there's a real benefit to the

22  Court in bringing to the Court dispositive or motions that may

23  streamline this case going forward at an early time just in

24  terms of educating the Court as to the issues that exist by

25  and between the parties and keeping it in the forefront of the

 1  business of the Court.

 2          As you all know, the life of a federal judge is

 3  affected substantially by the fact that a number of the people

 4  who work for the Court are there for one year, and this case

 5  naturally will be covering one or more years, and so other

 6  people are going to have to become educated as we move

 7  forward.  And it really helps to keep the Judge fully apprised

 8  and educated as to where the case is and conscious of it as it

 9  goes forward, I think.  Others may disagree.

10          The parties have indicated they've held their

11  Rule 26(f) conference in this matter, which is reflected in

12  the joint submission of the parties.  The parties have

13  signaled to the Court in their joint report when they will

14  commence written discovery and when they will provide their

15  initial disclosures under Rule 26(a).

16          As I understand, Mr. Spevacek, today is your day.

17          MR. SPEVACEK:  We will be filing ours later this

18  afternoon, Your Honor.

19          THE COURT:  Thank you very much.

20          And that the remaining parties have agreed that

21  February 1st will be their day to do their initial disclosures

22  and start that process.  And there is an indication that the

23  parties are formulating and moving forward presently with

24  their initial interrogatories.  Is that --

25          MR. SPEVACEK:  As a preliminary matter, Your Honor,

1   we believe that there's quite a bit of information that's

2   going to be exchanged that's going to require the entry of a

3   protective order first, and we've set January 25th as the date

4   that we would submit to the Court a draft of a protective

5   order for Your Honor's consideration.  But we believe that

6   there needs to be a protective order in place before quite a

7   bit of the information can be exchanged if for no other reason

8   that a lot of it is going to be dealing with patient records.

9          THE COURT:  Thank you.

10         MR. SANDS:  If I may, Your Honor, on that subject,

11  just to alert the Court, another complexity arises because

12  there are cases that are being defended by UMIA, and there

13  might -- and there will be privileged information within those

14  files that other parties to this case should not be allowed to

15  see, but, for example, Mr. Copenhaver's client would be

16  allowed to see.  So we're going to have to redact from some of

17  the files we might be producing to certain parties but not to

18  the insureds, for example.  So that's something we're going to

19  have to sort through, and I guess we'll certainly talk to

20  everyone about that and decide how we go about that, but there

21  are things -- because UMIA is participating in the defense of

22  some of the underlying malpractice cases, there will be, for

23  example, privileged communications from defense counsel in

24  those cases that shouldn't be disclosed to others.  There may

25  be health information that shouldn't be disclosed to others,

1   as Mr. Spevacek has referenced.  So we're also going to be

2   producing different redactions in these files to the parties.

3   I don't see any way around that.

4           MR. SPEVACEK:  None of the claimants are in the suit,

5   though.  So, I mean, I agree with you completely.  I have no

6   intention of prejudicing the Hospital's defense by producing,

7   in the course of discovery, claim file information that the

8   underlying claimants would love to be able to see but they're

9   not parties to the suit, which is why I think that the

10  protective order needs to allow us to be able to have full

11  disclosure between us but make sure that the pending claims

12  aren't impacted by the fact we're going to be exchanging

13  information concerning the handling of those claims.

14          THE COURT:  So we'll need to protect that information

15  through the Clerk's Office.

16          MR. SPEVACEK:  Right.

17          MR. COPENHAVER:  I mean, there's -- I guess that's

18  why it's complex, Judge, is we've obviously got HIPAA issues

19  that we have to comply with, and the discovery is going to

20  have patient information in it, and so we may address that and

21  may need to add some language to the protective order to make

22  it clear that, uh, that applies to HIPAA information and that

23  that is somehow kept confidential and protected.  I don't know

24  that I envision filing everything under seal, but we probably

25  need to work through that a little bit between now and

Julie H. Thomas, RMR, CRR                      (303)296-3056

1    the 25th.

2           And then, as both Jon and Chuck have mentioned, there

3    is going to be communication that is between the insureds and

4    the insurer relating to coverage that has got to be protected

5    so that it doesn't go to counsel and the parties that are

6    bringing these lawsuits.  Now, as they become parties to this

7    litigation -- for example, if Stambaughs become a party,

8    that's probably not a problem because Mr. Fix only represents

9    one party, but if counsel that represents other plaintiffs in

10   lawsuits that are pending but are not involved in the

11   assignment, that is going to become a very difficult issue.

12   It's not happened, it may not happen, but I'm just giving you

13   a heads-up.  And obviously we all need to think and deal with

14   that if it happens.  We don't need to deal with it today.

15          MR. SPEVACEK:  Yeah, I agree with Tracy.  If any of

16   the underlying claimants become parties to the litigation

17   because their cases have settled, then the concerns about

18   disclosure of information that would impact an ongoing piece

19   of litigation is a little bit allayed.  It's also the reason

20   why they aren't joined in the suit, nor do they need to be

21   joined in the suit.

22          There's also two types of discovery that we're

23   talking about here that needs to be protected from them.  As

24   we talked about, some of these cases are being defended by the

25   insurance companies, and as a result there's communication

1   going back and forth between the policyholders and their

2   insurers having to do with the defense of that case that

3   absolutely cannot get in the hands of the people who are

4   prosecuting the claims against the policyholders.

5           The other, then, has to do with internal information

6   from the insurers as to how they think about the cases, how

7   they evaluate them, which I'm not sure is ever going to be

8   discoverable, but my guess is that Tracy is going to be after

9   it in the context of these tort claims.  And it's all the more

10  reason as to why we might want to consider bifurcating the

11  discovery on the tort claims.  Because if we're going to get

12  into both discovery as to the coverage for the underlying

13  liability actions and at the same time dealing with discovery

14  as to the insurer's handling of the claims and whether that

15  rises to the level of tortious conduct or not, that just

16  multiplies exponentially the privilege issues we have and the

17  protection issues we have as to the second category of

18  information in terms of keeping it out of the hands of the

19  underlying claimants.

20          So, you know, it's going to be tough enough dealing

21  with the protective order and privilege issues as it relates

22  to the claims for which coverage is sought without having to

23  toss into the mix providing protection against the type of

24  discovery that I would expect the policyholders are going to

25  want to do with regard to their tort claims against the

1    insurers.

2         MR. COPENHAVER:  And the concern I've got with this,

3    and I'm already sensing that we're going to have this problem,

4    is that part of the basis for denial of coverage is an

5    allegation that the insureds had some knowledge about some

6    problems with regard to Dr. Hansen and, therefore, should have

7    foreseen that every claimant that has now brought a claim was

8    going to bring a claim.  We need to be able to do some

9    discovery as to why they formulated that decision to deny

10   coverage and how that's a basis for their decision to deny

11   coverage, as well as to why that is -- they bring one claim in

12   one lawsuit and they claim it's related to a lawsuit that

13   happened two years earlier, how does that relate to all the

14   other claims?  There's discovery that's going to relate to the

15   coverage issues, summary judgment, that -- it's going to have

16   to happen.  And we're going to need to see some of these files

17   in order to defend those claims.  It's not, as I think

18   Mr. Spevacek suggests, totally related to a bad faith claim.

19   I don't think you can put it in that one hole.  It relates to

20   coverage.  And we are going to seek that information.

21        So that's the concern we have about this phasing

22   discovery is you can't pigeonhole everything into bad faith.

23   We might be able to do that with experts.  I'm happy to do

24   that.  If we can save money, postpone that, we've already

25   structured that in our joint pretrial report I think for that

1   very purpose.  But to limit our ability to get the information

2   as to why the insurers are denying coverage and how they're

3   interpreting the policy and how they're interpreting the facts

4   that they're applying to that, uh, we're going to need that

5   information.  And that's the concern I've got with this idea

6   of, well, you're not going to do any discovery until we do our

7   summary judgments.  That just isn't going to work.

8           THE COURT:  Mr. Ramirez.

9           MR. RAMIREZ:  Thank you, Your Honor.  HealthTech and

10  Patten take the same position as Mr. Copenhaver and the

11  Hospital policyholders.  I guess one of the additional points

12  to make is efficiency, and a lot of -- a lot of the witnesses

13  that we're talking about either taking depositions or even

14  through written discovery, um, it would be duplicative to have

15  them, in a phased type of discovery setting, appear to testify

16  on the factual basis that the insurers want to set up their

17  motion for summary judgment and then have them come again and

18  be deposed on our issues.  It just seems like even at trial

19  where we have the one-up/one-down rule, if we've got a witness

20  who's got evidence as to both their claims and defenses and

21  our claims and defenses, it seems most efficient that we

22  conduct that deposition and get all of the evidence before us

23  in that one event.

24          The other issue, too, is the unique nature of the

25  rescission claim.  My understanding is that the Hospital is

1   now, because of the rescission effort that UMIA has taken, is

2   considering amending its pleadings now to bring its own bad

3   faith claims against UMIA.  So to the extent there's evidence

4   that's necessary to defend against that rescission claim,

5   that's also going to go to Mr. Copenhaver's bad faith claim.

6   So, like he said, trying to put these into separate buckets is

7   going to be almost impossible to do.

8              MR. SANDS:  May I, Your Honor?

9              THE COURT:  Mr. Sands.

10             MR. SANDS:  On that last piece, Mr. Copenhaver and I

11  have discussed this.  Mr. Ramirez indicates that there is no

12  bad faith claim pending.  All I can say is that in the claim

13  filed against UMIA by the Hospital, paragraph 41, as a result

14  of -- or UMIA's unreasonable acts and bad faith misconduct

15  have caused damages to the, the group, and so I don't know how

16  I could read that and not anticipate that there's a bad faith

17  claim there.  It would be irresponsible of me to do that.

18             So my read of the pleadings is that there are bad

19  faith claims asserted by both the Hospital, HealthTech, and

20  then their -- Mr. Patten and Dr. Hansen.  But where I do

21  see -- I actually agree with Mr. Copenhaver that development

22  of the factual bases for UMIA's position that, for example,

23  under our policy a records request is a claim if that records

24  request is made under circumstances that the insured knew or

25  should have known that a claim could be made.  So there's no

1  factual dispute, for example, on some of them that, by way of

2  example, records requests were made.  The discovery might go

3  to was that records request made under the circumstances

4  indicating that the Hospital and HealthTech knew or should

5  have known that a claim would be made.

6        And so I don't disagree with Mr. Copenhaver that

7  there is certainly a convergence of evidence on those two

8  things.  However, bad faith litigation, tort litigation

9  against an insurer is a whole different animal.  And what we

10  get, and I live in this world, for better or for worse, we get

11  these unbelievably invasive 30(b)(6) notices going less to the

12  claims and more to how you run your business, how you run your

13  claim department.  We routinely deal with things like requests

14  for people's personnel files and compensation plans and things

15  that really have more to do with them trying to prove a tort

16  claim based on how the insurance business is run rather than

17  let's get to the issues involving these claims and the

18  coverage component.  So that is where the discovery becomes

19  very invasive and very expensive and very time-consuming, in

20  my experience.

21        So that is an area where I do see bifurcation would

22  be make sense.  Let's put on ice that kind of discovery that

23  is collateral to what happened with these claims, and they

24  would be entitled I believe to the evidence as to why we do

25  think those, for example, claims were made during our policy

1   period under circumstances that would lead a reasonable person

2   to believe that a claim would be made.  So that's where I

3   could see some distinction.

4         MR. SPEVACEK:  Mr. Sands makes the point that I was

5   going to make, and actually sitting here listening -- there's

6   always a benefit just to sit and listen every now and then.

7   It sounds like we're actually not as far apart as we may think

8   we are.  For example, I think we've made progress that we all

9   seem to be in agreement that there's no need to identify

10  experts on bad faith at the same time we're identifying

11  experts on anything else we need to identify experts on,

12  because it could be that we won't even get to that point.  If

13  the Court finds there's no coverage for any of these things,

14  the bad faith claims go away.

15        And I also agree that we're not in any way trying to

16  limit the policyholders from doing discovery as to the bases

17  for the decisions to say that we're not going to provide a

18  defense, we're going to defend under reservation of rights, we

19  think we've got no coverage.  It's this type of additional

20  tort-only discovery that mucks things up.  Every claim you've

21  handled involving a hospital for the last 20 years, turn over

22  every piece of paper you've got.  Of course, we're not going

23  to be doing that voluntarily, and so we're going to be in the

24  front of you or a magistrate arguing what constitutes

25  reasonable discovery on other claims, other cases, you know,

1  whatever, where our people went to school, where they took

2  CLEs from, that sort of thing.

3        So that's what we're trying to section out here.

4  Let's focus first on the claims that were tendered for

5  coverage, are they covered or not.  And even if the Court

6  finds that they are covered, you may wrestle with it so much

7  as to whether -- what the decision is, you may say:  Look,

8  there was a reasonable basis for taking the position they did.

9  I can't see bad faith going forward under these circumstances.

10 I ultimately found they had coverage, but I had a hard time

11 deciding that they do that.  Well, that's not bad faith.

12       So let's get the coverage part of this resolved

13 first, and then let's deal with those issues that relate

14 exclusively to the tort claims.

15       THE COURT:  Well --

16       MR. RAMIREZ:  One more quick note, Your Honor.  I

17 apologize this is going on so long, but, for example, the

18 underwriting file, we've already -- and I think it's already

19 part of the proposed scheduling order.  That's a key issue for

20 us, and it's going to have both the bad faith components and,

21 you know, the predicate for whether or not there's coverage

22 under these claims that have been submitted to the insurers.

23       And I, too, like Mr. Sands, live in this world.  I'm

24 a policyholder representative, and I can assure you I have

25 never issued those types of discovery requests.  I don't see

```
 1   how they're helpful in these type cases.  What you are looking
 2   for is, you know, what the underwriters typically do on these
 3   types of risks, what they intend to do, what information they
 4   had, and the decisions they made.  And, I mean, that is fair
 5   game in determining whether or not the decision to deny
 6   coverage or -- in our case flat-out deny, in their case not
 7   agree to indemnify but only defend, whether or not those were
 8   reasonable.  And I think that's something that we should be
 9   entitled to discover.  And from what I'm hearing so far, it
10   sounds like they're not saying we can't do that.  So I agree
11   with Mr. Spevacek that we may not be as far off as we started
12   off at.
13           THE COURT:  I am sure that there will be questions
14   that arise during the discovery phase either if we phase it or
15   we do not.  On the one hand, if it's -- if there is no phasing
16   of the discovery process, it seems to me that we are
17   essentially trying this case as a noncomplex case, and we're
18   just imposing some deadlines the Court is going to put on the
19   parties to complete their discovery, and it just -- everything
20   is fair game at that point, and it -- except, and I haven't
21   heard any mention of it, we're all aware that the rules were
22   amended and December 1 went into effect, and it seems to me in
23   terms of many of your concerns, Mr. Sands and Mr. Spevacek,
24   that the issue of proportionality and the way that discovery
25   is conducted, the old rules don't apply anymore, and I think
```

1   you're entitled to rely upon that, as is -- as are the

2   defendants in this case to the extent that they're being sued

3   by other parties in federal court in terms of discovery.  And

4   I think the parties are well aware of the need that anything

5   potentially having some relation to the case is no longer the

6   rule, and we're going back to the time when we're looking for

7   relevant evidence.  And so there is a standard that's going to

8   have to be met.

9            I agree, I think there should be phased discovery in

10  this case.  I think it will assist the Court in terms of

11  understanding the issues at the heart of this case and allows

12  examination of the plaintiff's cases and UMIA's defenses that

13  they are asserting as well.

14           Now, the issues raised by Mr. Ramirez and

15  Mr. Copenhaver, I think Mr. Sands at least has signaled that

16  many of those are just concerns at this -- at this point as to

17  what would be available to them in discovery and I think can

18  be hashed out in the process of discovery that will take

19  place.

20           Mr. Spevacek, does the plaintiff have any thought

21  about the phasing and how that needs to be incorporated into

22  this order?

23           MR. SPEVACEK:  Yeah, Your Honor, I would think that

24  if the Court put in the order a generalized statement that

25  there will be phased discovery and that discovery relating

1   exclusively to the tort claims of bad faith asserted by the

2   policyholders against the various insurers will be phased and

3   will be held at some point in the future.

4          And I honestly think that it doesn't make any sense

5   to begin it until there's been a final resolution of whether

6   there's coverage for this or not because there are three ways

7   that this could go.  One would be the Court finds there's no

8   coverage, in which case there's no sense talking about bad

9   faith anymore because our denials would have been proper.  The

10  second would be the Court finds, yeah, there's coverage for

11  some of these, maybe not coverage for others of them, and I

12  find that it was a close call, but I'm still going to say that

13  maybe a couple of the three cases you've got to cover, or

14  maybe three or four of them you don't have to because there

15  are individual circumstances.  But in the course of going

16  through that process the Court determines, you know, there was

17  a reasonable basis for the decisions that the insurers made,

18  and that's the threshold question as to whether we go forward

19  on bad faith, in which case we don't go forward on bad faith

20  in that circumstance either.  Or the third would be the Court

21  was so appalled by the decisions the insurers made, it was bad

22  faith, discovery can go forward.  And we don't think that's

23  going to happen.

24         But I think you could structure an order that would

25  say that discovery relating exclusively to the tort claims

```
 1   asserted by the defendants and third-party plaintiffs against

 2   the insurers will be phased and will be conducted after the

 3   conclusion of the issues on the merits on plaintiff's claims

 4   for coverage and the counterclaims asserted by the insurers

 5   for coverage.  So let's discover it.  Let's determine coverage

 6   first.  Then we'll have another Rule 26(f) meeting and

 7   Rule 26(f) report if the Court thinks that bad faith should go

 8   forward.

 9           THE COURT:  I agree.  I think the order should be

10   structured that way.

11           MR. COPENHAVER:  Your Honor, I don't have a problem

12   or concern as long as, as Mr. Spevacek mentioned, we're

13   talking about discovery exclusively related to bad faith will

14   be delayed.  Because clearly there is discovery that relates

15   to both, and I'm going to be surprised if we're not back in

16   front of Your Honor or a magistrate having this decision which

17   phase is this in.  I promise you we will work in good faith

18   with all counsel to not do that, but I have that concern.

19           MR. SPEVACEK:  Yeah, I agree with Tracy.  We did

20   actually pretty well on putting the joint report of the

21   meeting together, so it gives me some hope in thinking that we

22   can do pretty well on the other things that happen to come up.

23   But there's no way that the Court in an order at this point

24   can account for every conceivable possibility that might

25   happen down the line.  So we just need a broad guideline, and
```

1   then we'll work as things come up as to how we think it fits

2   within that broad guideline.

3            THE COURT:  I think that's all we can do.

4            So we'll see the protective order on or before

5   the 25th of January.  We will have phased discovery in this

6   matter.

7            Electronic discovery is an issue that you talked

8   about, and defendants indicated a preference.  Any thoughts

9   about that?

10           MR. SPEVACEK:  Go ahead.

11           MR. RAMIREZ:  Well, since it was my language that was

12  inserted, our concern is in prior litigation we find that

13  insurance companies tend to maintain their claims files in

14  electronic format, and so what we run into is when we ask for

15  the production of the claims files, they will print out their

16  claim files, scan them, and we get a 5,000-page PDF that's not

17  searchable.  I mean, that just tends to happen quite a bit.

18  So to avoid that we inserted our standard ESI protocol into

19  the scheduling order, and I believe -- I've heard back from

20  several of the attorneys that they could work with it but that

21  they needed to confer with their clients to make certain that

22  their IT folks were able to comply with it.  I have not heard

23  anything since those e-mails, so maybe we can hear from them.

24  But the language came from us.

25           MR. SANDS:  Your Honor, on behalf of UMIA, there are

1   limits to what we can and can't do in terms of turning files

2   over.  In speaking with Mr. Ramirez, I understand that what

3   they want is this stuff in a format that is --

4           THE COURT:  Searchable.

5           MR. SANDS:  -- searchable, and I don't know what the

6   technical -- technological capabilities of my client's system

7   might be.  I -- we are able to, at least have been in cases

8   these days, to convert PDF documents to searchable documents.

9   So I'm not suggesting Mr. Ramirez is wrong.  I'm just saying I

10  think there is a way to do that, at least in many

11  circumstances.  But the more relevant point is this.  I don't

12  know what the technological capabilities of my client's

13  electronic file system might be, so it's very difficult for

14  me -- and certainly I've asked them to look and see what

15  formats we can produce these things in, but I'm really not

16  today in a position to say we will produce them in the format

17  that Mr. Ramirez wants.

18          THE COURT:  When can we get that resolved?

19          MR. SANDS:  Well, one of the threshold questions is

20  do we need to produce the entire claim file as a matter of

21  Rule 26 disclosure.  I don't think we do, but we're

22  ultimately, I think, going to get a request for the entire

23  claim file, so we're working on that.  I think I can have that

24  resolved, I would hope, within a week.  They're looking at

25  what they can and can't do.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1              THE COURT:  What about the 25th, again, of January?

2              MR. SANDS:  I'll -- I'm sorry.

3              MR. SPEVACEK:  No, go ahead.

4              MR. SANDS:  I'll work with -- yes, I'll report to my

5    client that that's the date, and if I have a problem, I'll let

6    everyone know.  I shouldn't, but I would think we could do it

7    by then.

8              THE COURT:  All right.

9              MR. SPEVACEK:  Here's what I think the issue is, Your

10   Honor, that -- what Mr. Ramirez proposed is extremely

11   specific, TIF, Type 4, 300 DPI resolution, you know,

12   et cetera.  The issue, I believe, is whether it's searchable.

13   As opposed to the issue being a certain type of format or

14   technology, the issue is that it's searchable.  And what I was

15   concerned about in dealing with my clients was that in an

16   effort to provide something that's searchable, it might not be

17   the exact technical requirements that are written into the

18   report by Mr. Ramirez and his client.

19             And so I certainly like the idea of documents being

20   produced in a searchable format.  What my client is looking at

21   is whether a specific type of technology to make that happen

22   can be imposed upon it or not.  So if -- the issue isn't the

23   nature of the technology.  The issue is can you search the

24   stuff, as opposed to being provided with a thousand

25   pages -- I'm sorry -- as opposed to being provided with a

1  thousand pages of stuff that is just printed out on paper.

2  And I'm all in favor of searchable.  I'm just still trying to

3  figure out from talking to -- my -- because I can't talk to my

4  client's IT people.  I can't even talk to my son about how to

5  program apps on my iPhone.  What we're working with is is the

6  technology that's imposed upon us in this agreement something

7  that's compatible with our systems, or can we produce

8  searchable documents in some other format.

9           MR. RAMIREZ:  Your Honor, real quickly.  It just --

10  it wasn't just searchability.  It's also we want the data

11  that's behind the documents.  So to the extent that their

12  files are being produced in native format when we could see

13  the actual history of documents that were issued, I think

14  according to the Sedona principles, which I think this is

15  where this comes from, it seems to be the standard for

16  production of ESI.  So that's why we've included and we've

17  requested that documents that are produced in this case, not

18  just the claim file, but any documents, e-mails, drafts of

19  letters, to the extent there's any Excel spreadsheets, things

20  like that, be produced subject to these principles that have

21  been adopted by most federal courts.

22           THE COURT:  Why don't we refer to a response on or

23  before the 25th of January consistent with the Sedona

24  principles.

25           MS. KELLAM:  That's fine with Lexington, Judge.

1   Thank you.

2          THE COURT:  Very well.

3          The parties have provided a paragraph dealing with

4   Rule 26(f)(3)(E) which responds to our request.  "In an effort

5   to encourage coordination and to avoid duplication and

6   redundancy of discovery, all interrogatories, document

7   requests and requests to admit served by any party inure to

8   the benefit of and are enforceable by any other party.  The

9   settlement, release or dismissal by any means of a party

10  propounding such discovery will not limit the use of responses

11  to discovery, nor will it eliminate the obligation of the

12  responding party to supplement its responses to discovery as

13  required by Rule 26(e)."

14         Is that -- everybody on board?

15         MR. SPEVACEK:  Yes.

16         MR. COPENHAVER:  Yes.

17         MR. SPEVACEK:  We talked about this at length during

18  the conference.  This was our suggestion.

19         THE COURT:  I've run into problems in that whole

20  area, and if we can avoid them at this point, that's a good

21  idea.

22         MR. SPEVACEK:  We're just trying to make sure

23  that -- there's three different insurers here -- that all

24  three insurers don't feel they have to ask the same

25  interrogatory question over and over again, because one

1   insurer might settle out and, thus, the need to supplement as

2   to that insurer's question will then go away.

3          MS. NALTSAS:  Your Honor, Lexington agrees with this

4   proposed paragraph.

5          THE COURT:  Very well.

6          MR. SANDS:  As does UMIA, just subject to our

7   discussion earlier about any possible need for protection.

8   Some of the information that might have been disclosed by some

9   party in discovery responses that should not be given at all

10  to another party, and we don't know what they're going to look

11  like exactly yet, I would just put that proviso in there, but

12  we're certainly on board with the idea that everybody gets the

13  discovery and can rely on it.

14         THE COURT:  Very well.  You've agreed also to a

15  number --

16         MR. SPEVACEK:  Yes, Your Honor.

17         THE COURT:  -- 35 written, including all discrete

18  subparts.  And again there's a good faith standard.

19         Homeland anticipates it will be submitting its

20  interrogatories on or before March 1st, 2016.

21         MR. SPEVACEK:  Yes, Your Honor.

22         THE COURT:  Same for HealthTech, Patten, and PVHC and

23  Dr. Hansen.

24         MR. RAMIREZ:  That's correct.

25         THE COURT:  Is Dr. Hansen still living in Powell?

 1            MR. COPENHAVER:  No, I think he's in Montana, Your

 2   Honor.

 3            THE COURT:  Oh.  All right.

 4            MR. SANDS:  Your Honor, if I may again.

 5            THE COURT:  You anticipate sending them a little

 6   earlier.

 7            MR. SANDS:  I think it's a mistake.  I think I wanted

 8   to go with March 1st as well, so I'm not sure how I ended up

 9   failing to make that correction.  That's my fault, but we'd

10   like to have that be March 1 as well.

11            THE COURT:  Very well.  And Lexington, you're just

12   sitting on this thing until May 1st.  What's --

13            MS. NALTSAS:  So as not to duplicate efforts, we'd

14   like to sort of see what the discovery pans out as, and we may

15   not have to send the same interrogatories twice.  So we wanted

16   to see what is asked by the other parties, and then we can

17   supplement where needed.

18            THE COURT:  All right.  I think we have time.

19   May 1st is fine.

20            The parties have listed the oral depositions that

21   they anticipate -- let me ask counsel for the plaintiff,

22   Mr. Spevacek.  Who are these folks? I guess is the nature of

23   my question.  I don't know -- are they related to the first

24   phase?

25            MR. SPEVACEK:  Yeah, they're all related to the first

1   phase.  Brad Mangum and Scott Wilson are the two whistle

2   blowers that are referred to in our complaint.  The rest are

3   Hospital staff members --

4             THE COURT:  All right.

5             MR. SPEVACEK:  -- of some fashion or another.

6             THE COURT:  All right.  And Mr. Copenhaver, I assume

7   that your list, which is a little longer, may be not in

8   anticipation of phased discovery at this point.

9             MR. COPENHAVER:  Um, it wasn't in anticipation of

10  phased discovery, you're correct, but I don't think it would

11  change.  Those people listed are the people that wrote

12  coverage opinions or decisions that we received from the

13  various insurers.  So, I mean, they're -- they're the face of

14  the company in making the decisions on coverage, so they're

15  going to be deposed.  And I would say that probably in light

16  of the rescission position of UMIA and the disclosure of

17  information to them, I'm guessing we're going to need to add,

18  actually, possibly a couple of people from the brokerage firm

19  that they partnered with in making the proposal to Powell and

20  that information was disclosed to them and through them.  So I

21  would just represent that they're probably going to be added,

22  and possibly a representative of the insurance agency that

23  also submitted information to both One Beacon and UMIA.

24            MR. SPEVACEK:  Your Honor, we never expected these

25  lists to be exclusive at this stage of the proceedings and --

1    for example, we didn't anticipate that we needed to list

2    generically the idea that there might be 30(b)(6) witnesses,

3    and we would reserve the right to do that, too, but I don't

4    think anyone sitting here now is saying, all right, these are

5    the names you put down, these are the only depositions you get

6    to take.

7            THE COURT:  All right.  I just thought any disclosure

8    we could have today would be helpful to you all, frankly.

9            And UMIA, a much longer list, similarly.

10           MR. SANDS:  Yes, but there's a lot of duplication,

11   Your Honor.  Five of those deponents proposed on page 13 are

12   also on the list -- on Homeland's list.  And I, I did just

13   generically list 30(b)(6), but I agree with Mr. Spevacek that

14   certainly wasn't -- I mean, that was belt-and-suspenders on my

15   part, but I absolutely agree this certainly wasn't meant to be

16   an exclusive list.  And I do think these go to -- most of

17   these would go to the coverage piece.

18           THE COURT:  All right, good.  Like every case that

19   you have, events occurred -- many of these events occurred

20   several years ago.  You'll probably be dealing with the

21   problems of people leaving the companies or changing jobs or

22   moving away or retiring or being terminated.

23           MR. SPEVACEK:  That's why we built so much time into

24   the depositions, Your Honor, because we happen to know that,

25   for example, Brad Mangum and Scott Wilson are not within the

1    jurisdiction.  It's not going to be easy to arrange these

2    depositions.  There's going to be a lot of travel involved.

3           THE COURT:  And probably track down some documents,

4    anyway, that they'll need to refer to during their deposition

5    testimony.  That's the reason I'm glad I'm a judge and not a

6    lawyer.

7           I can't anticipate in this case when you'll have new

8    parties in this case.  I'm not sure, listening to you, that

9    it's really important at this point.  And so I'm going to

10   strike that date with regard to new parties in our order,

11   which we put down March 1st.  You don't know, Mr. Copenhaver,

12   whether or not we'll -- who and when we'll have those, and

13   those settlements are ongoing probably over the next couple of

14   years.

15          MR. COPENHAVER:  You're absolutely correct, Your

16   Honor.  Thank you.

17          THE COURT:  Amendments to pleadings, there may be

18   some.  Do you think those, at least the ones that may come to

19   mind, could be done by March 1st, 2016?

20          MR. COPENHAVER:  Um, yes.  Mr. Sands referenced,

21   uh -- we had a claim for breach of contract, and there was a

22   reference in there to it being unreasonable and in bad faith.

23   I didn't intend that to be a separate bad faith claim, but in

24   view of their position on rescission, uh, it's likely we will

25   amend our pleadings to actually assert a bad faith claim.

1            THE COURT:  All right.  Mr. Sands, you were

2   prescient.

3            MR. SANDS:  I'm sorry, Your Honor?

4            THE COURT:  You were prescient.  You --

5            MR. SANDS:  Yes.

6            THE COURT:  Any other amendments that anybody is

7   seeing?  Doubt it.

8            MR. SPEVACEK:  New claimants keep coming forward all

9   the time, and we tried to plead the complaint in a manner so

10  that we didn't have to continuously be re -- amending it all

11  the time.  So it's not our intention to do so unless we hear

12  from the policyholders that a finding of no coverage isn't

13  going to relate to someone who is specifically identified by

14  name in the complaint, in which case then every time a new

15  claim is tendered to us, and we're still getting them, we

16  would have to ask to amend the pleading to include those

17  claimants.  And sometimes these claims come to us in a way

18  that we can't identify them by name in the complaint, you

19  know, because they're not suits yet, they're just notices to

20  the -- to the state of an intent to bring suit, and we're

21  prohibited from disclosing those names in an open pleading

22  like this.

23            So I thought we talked about this on the call, but

24  I'm having a little bit of a brain freeze as to what our

25  resolution to it is.  Did we agree that as new claims are

1  tendered they're considered part of the litigation, or do we

2  have to actually amend pleadings to include them?

3         MR. RAMIREZ:  My recollection, Mr. Spevacek, was that

4  we had different opinions on that.  I think you were the only

5  one that said you had drafted your pleading to encompass any

6  future changes, and we took the position that in order to make

7  sure that this action was binding on all possible claims that

8  are out there that the parties should list the new claims or

9  amend the pleadings to include the new claims that are filed.

10         One of the things that we talked about was the

11  potential running of the statute of limitations, so that we

12  believe that as of November -- towards the end of November I

13  think was potentially the running of the statute of

14  limitations, so we may have the known universe of claims that

15  are out there already.  But I think our position is that, just

16  to be thorough and make sure this action is binding on all

17  parties, that we should include all new plaintiffs.

18         MR. SPEVACEK:  Could I propose something to the

19  Court, then, that would take some burden off of the Court?

20         THE COURT:  Sure.

21         MR. SPEVACEK:  Can everyone agree that to the extent

22  the only amendment is going to be to identify a newly tendered

23  claim since the filing of this complaint as one that is also

24  subject to the declaratory judgment action that we've

25  commenced, that we can make that amendment without leave of

1    Court?  We don't have to bother the Court with it?

2            MR. SANDS:  And I would agree with that procedure,

3    Your Honor.  Because if we have to run in every time, it's

4    going to cost, obviously, time and expense and the Court's

5    time.  And it would need to be included in our declaratory

6    judgment claim as well and our coverage -- our coverage case

7    because all of the claims that come in are going to

8    be -- going to fall within that grouping.

9            And the other thing I guess I would say is that the

10   statute of limitations piece, I very much appreciate what

11   Mr. Ramirez has said, but the running of the statute of

12   limitations oftentimes does not prevent people from suing

13   anyway.  So I don't necessarily agree that we have a known

14   universe of what might come in.

15           MR. SPEVACEK:  Your Honor, I'd also be willing to

16   stipulate that unless someone wants to plead something new in

17   response to a newly tendered underlying claim, that existing

18   answers, counterclaims, crossclaims, and third-party

19   complaints can stand as in response to the amended complaint.

20   Otherwise -- this just represents, printed on both sides, the

21   pleadings so far, answers, complaints, counterclaims,

22   third-party complaints.  And if we keep having to redo the

23   same thing -- I mean, I understand it's just word processing,

24   but if all we're doing is just amending the complaint to add a

25   newly tendered claim that came in subsequent to the time that

1   we filed the document that's already on file, I don't care

2   whether I see exactly the same answer back in response to it

3   that's already in my file.

4           MR. COPENHAVER:  And I don't have any problem with

5   that, Your Honor.  I'm all about keeping it as simple as we

6   can.  But I just want to -- my understanding would be is if,

7   for example, Homeland amended its complaint to add a party,

8   that unless otherwise specifically noted, the basis for their

9   denial of coverage would be limited exactly to what they have

10  previously pled, and there would be no new claims sprung on us

11  or allegations.  And if that's the case, it will need to be

12  addressed in the amended pleadings.

13          MR. SPEVACEK:  We're fine with that, Your Honor.

14          THE COURT:  Very well.

15          MR. SPEVACEK:  If we're raising some new grounds for

16  denial that we haven't already pled as to a new claim that was

17  tendered to us for defense or indemnity after we had filed

18  whatever pleading is already on file, then we understand we've

19  got to go through the normal process of saying we want to add

20  something new.  But if all we're adding is, hey, here's

21  another person we're adding to the litany of people who have

22  made claims, and we think they've got no coverage for the same

23  reasons we've already pled, I'd like to just be able to add

24  those names without having to do anything else.

25          MR. RAMIREZ:  Your Honor --

Julie H. Thomas, RMR, CRR                        (303)296-3056

```
 1              THE COURT:  So pursuant to Rule 15, huh?

 2              MR. SPEVACEK:  Yes, Your Honor.

 3              MR. RAMIREZ:  Your Honor, HealthTech and Patten would

 4   have no objection to that.

 5              MS. NALTSAS:  That's fine with Lexington as well,

 6   Your Honor.

 7              THE COURT:  Thank you.  I believe plaintiff's expert

 8   witnesses -- you've indicated a date of January 6th, 2017.

 9              Or are these our dates, Sean?

10              MR. SPEVACEK:  Yeah, and actually the form talks

11   about plaintiff's or that party who bears the burden of proof

12   on an issue.

13              THE COURT:  And counterplaintiffs.

14              MR. SPEVACEK:  Yeah, right.  So we're sort of looking

15   at it as like first expert disclosures and second expert

16   disclosures.  So it could be that I'll be making some expert

17   disclosures.  I would expect that HealthTech and the Hospital

18   will be making some first expert disclosures.  But if it's an

19   issue that you are using an expert to help meet your burden of

20   proof, then, yes, we have that first deadline as January 6th

21   of 2017.

22              MR. COPENHAVER:  Your Honor, I guess I just -- now

23   that the Court has determined we ought to do phased discovery,

24   I don't know that that deadline is going to work for

25   designating experts on behalf of the defendants as it relates
```

 1  to bad faith.  Because if we're not allowed to conduct

 2  discovery on it, we're not going to be prepared to do experts

 3  either.

 4          THE COURT:  No, we're not requiring you to.

 5          MR. SPEVACEK:  Yeah, there was never any intention

 6  that -- given the conclusion that we'll have phasing, I never

 7  expected that you were going to have to do bad faith experts

 8  on that date.

 9          MR. COPENHAVER:  It's just not what that order says

10  and our agreement says, so I wanted to make it clear on the

11  record.  So that will not apply to our designation of experts.

12          THE COURT:  No.

13          MR. COPENHAVER:  Thank you.

14          MR. SANDS:  And presumably the same from UMIA's

15  standpoint.  We're being sued for bad faith.  We would do

16  whatever it is the Court ultimately finds is going to be done

17  with bad faith experts.

18          THE COURT:  Correct.  They would be listed after

19  we've ruled on any motions that are going to be filed in the

20  near future and later on.

21          Counterdesignations, uh, to the first phase experts

22  would be on March 7th --

23          MR. SPEVACEK:  Yes, Your Honor.

24          THE COURT:  -- 2017, I think is your date.

25          The parties have indicated -- this would be all fact

 1   discovery on first phase would wind up on May 5th, 2017.

 2           MR. SPEVACEK:  We have -- November 1 is fact

 3   discovery, because we're distinguishing between fact discovery

 4   and expert discovery.

 5           THE COURT:  Okay.

 6           MR. SPEVACEK:  So fact deposition -- I'm sorry for

 7   not standing up, Your Honor.  Fact depositions would take

 8   place between May 1st and November 1, and the close of fact

 9   discovery would be November 1.  That's what's in the

10   agreement.  And then we would move into expert discovery.  So

11   first expert disclosures then on January 6th, second expert

12   disclosures on March 7th.  First expert depos would be done in

13   that time period between January 6th and March 7th.  Those

14   would have to be done by March 7th.  And second expert

15   depositions would have to be done by May the 6th, with the

16   close of expert discovery on May 6th.  So we're looking for

17   the close of all discovery, fact and expert, on May 6th of

18   2017, but the close of fact discovery on November 1st of 2015.

19           THE COURT:  '16.

20           MR. SPEVACEK:  '16.

21           THE COURT:  '16.

22           MR. RAMIREZ:  Your Honor, just briefly.  Just to be

23   clear, the dates that Mr. Spevacek has just proposed, that's

24   the end of Phase I only.

25           MR. SPEVACEK:  Right.

Julie H. Thomas, RMR, CRR                          (303)296-3056

1           THE COURT:  Yeah, that's all we're talking about.

2           MR. RAMIREZ:  Okay.

3           THE COURT:  Yeah, it would probably be helpful for us

4   to amend our -- or put in some sort of -- something in the

5   title of this document that you will be getting that would

6   reflect that this relates to Phase I, initial pretrial

7   conference as to Phase I.

8           Now, dispositive motions.

9           MR. SPEVACEK:  The thing that we put in the

10  agreement, Your Honor, was that we didn't want to put any

11  artificial deadlines on the ability to make dispositive

12  motions, they could be made at any time, and if a party

13  believes that it's premature because discrete discovery needs

14  to be done, then they can make the showing under 56(f), but we

15  did not want to say that we were going to wait till the close

16  of any specific discovery period to bring any dispositive

17  motions that could be brought.

18          THE COURT:  Can we put an outside date of May 19th,

19  2017?

20          MR. SPEVACEK:  That's fine with us, Your Honor.

21          MR. SANDS:  Yes, Your Honor.

22          THE COURT:  And maybe we should put a note in here

23  that dispositive motions may be filed at any time prior to

24  May 19th.  And responses will be filed according to the

25  Federal Rules of Civil Procedure or within the time limits

 1   prescribed by the Federal Rules.

 2            MS. KELLAM:  Thank you, Your Honor.

 3            THE COURT:  Did you get that, Sean?  Thank you.

 4            On Phase I do you see a -- well, let me think about

 5   that for a moment.  Let's assume for the moment that your

 6   dispositive motions are denied by the Court and I find that

 7   there are issues -- material issues of fact that need to be

 8   tried on your motions.  At that point counterplaintiffs in

 9   this matter would be -- have all of their claims that we would

10   begin discovery on.  Correct?

11            MR. COPENHAVER:  That would be our opinion, Your

12   Honor.

13            MR. RAMIREZ:  Your Honor, with respect to the tort

14   claims, you're saying?

15            THE COURT:  That's correct.

16            MR. RAMIREZ:  Yes.

17            MR. SPEVACEK:  Yes.

18            THE COURT:  And so there's really not much point in

19   me at this point setting a joint final pretrial and trial

20   schedule.  We would have a later -- our order should indicate

21   that there will be a subsequent Rule 26 meeting.

22            MR. SPEVACEK:  Yeah, that makes sense, Your Honor.

23            THE COURT:  All right.  I think I've covered

24   everything on my agenda at this point.  Is there anything else

25   that you were thinking of or questions that we need to discuss

1    this morning by and between the parties?

2          MR. RAMIREZ:  Your Honor, I apologize because I have

3    not conferred with opposing counsel, and I've just been

4    thinking about this case for the last few days, and so I'll

5    bring this out to them to think about, and maybe we can

6    address the Court about it at a later date.

7          This case seems to me to be a case where the parties

8    should be aligned or realigned.  I'm sorry.  Because the way

9    it stands now with all of the parties -- looking at who's

10   sitting at this table, for instance --

11         THE COURT:  What I've thought about that is maybe

12   that UMIA should be treated as a plaintiff in this case.

13         MR. RAMIREZ:  Or us as the plaintiffs and all the

14   insurers as defendants.

15         THE COURT:  Right.

16         MR. RAMIREZ:  Some way to get everybody on the

17   same -- or on opposite sides of the beams where they really

18   should be.  So I throw that out there just for consideration.

19   But, again, I apologize for bringing this up at this point.

20         THE COURT:  Something you might want to discuss

21   amongst yourselves.

22         MR. SANDS:  I actually don't disagree.  I didn't even

23   know what to call my pleadings.

24         THE COURT:  Well, I can tell you it really created

25   problems for me to try and -- constantly having to go back and

1  try to sort out what was going on, and I'm not sure I have it

2  down yet.

3          MR. SPEVACEK:  It makes sense to me, too, Your Honor.

4          THE COURT:  All right.

5          MS. NALTSAS:  As it does for Lexington.  Thank you.

6          THE COURT:  All right.

7          MR. COPENHAVER:  The only other thing I'd bring up,

8  and have not discussed it with counsel, not really given it a

9  lot of thought, but -- I don't remember if it was Jon or Chuck

10 brought it up, but it sounds like we already are going to have

11 an issue -- because we are going to want the claims files, and

12 I heard one of them suggest that they weren't going to give us

13 all the claims file.  And maybe we can talk about that because

14 I don't know what, if that's the case, what they're intending

15 to hold back, but as long as we have Your Honor here and if

16 there's a way to resolve it, I'd just as soon do it rather

17 than wait to do it.  And so I'm not even sure what they're

18 talking about at this point.

19         MR. SANDS:  Well, I think I'm the guilty party.  What

20 I said is I don't think we're compelled under Rule 26 to

21 disclose them.  I think Rule 26 requires us to disclose things

22 that we're going to use in our defense.  I haven't made any

23 decision about it.  I did not mean to say -- and if I did, I

24 was jumping ahead -- that we aren't going to do it or that

25 they would not be available pursuant to a Rule 34 request.  So

1  my point was I want to be clear that I do not believe we're

2  compelled if we're not going to use things in our defense to

3  produce them under Rule 26.  Not saying we don't -- we've made

4  a decision about that, but that was my point.

5         MR. COPENHAVER:  If that's the case, that's fine.  I

6  didn't understand it that way.  Thank you.  I mean, we will be

7  making a request under Rule 34 for those files.

8         MR. SPEVACEK:  Yeah, we're in the same position.

9  We're not going to produce claims files as part of our Rule 26

10 initial disclosures because we're not relying upon the claims

11 files to prove the points that we've pled in our complaint.

12 But I don't anticipate a blanket objection to claims files in

13 a request for production of documents or an interrogatory

14 asking to identify documents.

15        MR. COPENHAVER:  Thank you.

16        THE COURT:  All right.  Within the next day or so

17 you'll be receiving the order from this hearing.  Corrections

18 or elaborations that you feel should go in should be brought

19 to my attention.

20        I am inclined in this matter to also put in a

21 provision -- tell me if I'm making an error doing so --

22 incorporating into this order the joint report of meeting.

23        MR. SPEVACEK:  I have no objection to that.  I think

24 the only edit was that Mr. Sands wanted until March 1 instead

25 of February 15th to serve interrogatories.

1            MR. COPENHAVER:  You know, we've made several

2    revisions to that, Your Honor has, and I just -- I don't know

3    if we're helping by doing that or confusing things by doing

4    that.

5            THE COURT:  Yeah.

6            MR. COPENHAVER:  For example, the phased discovery,

7    the fact that fact discovery only, you know, relates to the

8    underlying claims not the tort claims.  We've got the

9    electronic information stuff in there.  I'm not definitely

10   opposed to it.  I'm just speaking out loud, Your Honor, as to

11   whether we're helping ourselves by doing that or not.

12           THE COURT:  Maybe I should -- well, this order then

13   that I issue should indicate and give you the -- make as a

14   matter of order, anyway, things such as your agreed date

15   concerning furnishing a privilege or a protective order and

16   that kind of thing.  We can do that as well.

17           MR. RAMIREZ:  Your Honor, I have seen that done on

18   one occasion where the magistrate judge really just marked up

19   our proposed scheduling order and, you know, so the actual

20   order that was in place was his handwriting over the dates

21   that we had.  And I don't know if Your Honor's been doing that

22   here, but --

23           THE COURT:  No.  I have a separate order that I've

24   been working on.

25           MR. SPEVACEK:  You could also just make a notation in

1  your separate order that the joint report is attached and

2  represents the agreement of the parties except as modified in

3  this order.

4          THE COURT:  Yeah.  I think that would be good

5  language.

6          Any other things, Mr. Ramirez, come into mind?

7          MR. RAMIREZ:  Not at this time, Your Honor.

8          THE COURT:  Thank you.

9          Mr. Copenhaver?

10         MR. COPENHAVER:  No.  Thank you, Your Honor.

11         THE COURT:  Thank you.  Do you see this case -- the

12  alignment of the parties really is probably going to shape --

13  shape burdens of proof for you to -- something for you to be

14  thinking about.  May be not an immediate problem in this

15  matter.  I'll look for your thoughts later on on that entire

16  matter.

17         There being nothing further, we'll stand in recess.

18  Thank you, those of you who traveled from California who are

19  here today, from Denver.

20         MR. SANDS:  Thank you, Your Honor.

21         MS. KELLAM:  Thank you, Your Honor.

22         MS. NALTSAS:  Thank you, Your Honor.

23     (Proceedings concluded 10:58 a.m.,

24     January 14, 2016.)

25


Julie H. Thomas, RMR, CRR                    (303)296-3056

1                         C E R T I F I C A T E

2

3

4              I, JULIE H. THOMAS, Official Court Reporter for the

5    United States District Court for the District of Wyoming, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein on the aforementioned subject on

9    the date herein set forth, and that the foregoing pages

10   constitute a full, true and correct transcript.

11             Dated this 28th day of September, 2017.

12

13

14

15                      /s/ Julie H. Thomas

16                    JULIE H. THOMAS
                    Official Court Reporter
17                 Registered Merit Reporter
                  Certified Realtime Reporter
18                     CA CSR No. 9162

19

20

21

22

23

24

25