**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

FILED
DISTRICT OF WYOMING
U.S. DISTRICT COURT
APR ~~ 2019
U.S. MAGISTRATE JUDGE

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, | |
| Plaintiff, | |
| v. | Case Number: 1:15-cv-00031-ABJ |
| SCOTT J. GOLDSTEIN, *on behalf of* Powell Valley Healthcare Inc, | |
| Defendant, | |
| AND | |
| SCOTT J. GOLDSTEIN, *on behalf of* Powell Valley Healthcare Inc, | |
| Counter-Claimant, | |
| v. | |
| HOMELAND INSURANCE COMPANY OF NEW YORK and LEXINGTON INSURANCE COMPANY, | |
| Counter-Defendants. | |

## ORDER ON PLAINTIFF'S MOTION TO COMPEL

This matter comes before this Court upon *Plaintiff's Motion to Compel* [Doc. 119]. Plaintiff Homeland Insurance Company of New York ("Homeland") brought the underlying case seeking a declaratory judgment as to its obligations under the insurance policy it issued to Defendant Powell Valley Healthcare ("Powell")[1] [Doc. 1 p. 2]. During the period in which Homeland insured Powell, Powell was sued multiple times for negligent care provided by its Dr.

---

[1] Following Powell's bankruptcy, Scott J. Goldstein became Powell's Personal Injury Trustee, and subsequently supplanted Powell as the party in this matter [Doc. 98].

1

Jeffrey Hansen ("Dr. Hansen"). *Id.* Homeland claims that it has no duty to defend or indemnify Powell because Powell was aware of Dr. Hansen's poor treatment prior to the insurance policy's inception [Doc. 120 pp. 2-3].

Homeland now moves to compel the production of documents detailing Powell's awareness of any problems related to Dr. Hansen's care prior to the issuance of Homeland's insurance policy, and to compel Powell to supplement and expand their discovery responses [Doc. 119]. Powell has refused to produce these documents and supplement their discovery, arguing the requested information is protected under various privileges and are disproportionate to the needs of the case [Doc. 124].

### A. Standard of Review

The Federal Rules of Civil Procedure allow parties to

> obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed.R.Civ.P. 26(b)(1).

This Court has "broad discretion to control and limit discovery." *Teton Mill Work Sales v. Schlossberg*, 2007 WL 9657995, at *2 (D. Wyo. June 22, 2007). The party resisting disclosure bears the burden of proving privilege. *Greenwood v. Wierdsma*, 741 P.2d 1079, 1089 (Wyo. 1987). The party seeking disclosure has the burden to demonstrate entitlement to the records when disclosure withheld pursuant to W.S. § 35-2-610(a)(ix). This motion addresses the application of statutory privileges and disclosure restrictions as enacted by Wyoming. Federal Rules of Evidence 501 addresses the application of privileges in Federal Courts. That rule reads:

2

**Rule 501. Privilege in General**

The common law—as interpreted by the United States courts in the light of reason and experience—governs a claim of privilege unless and of the following provided otherwise:

- The United States Constitution;
- A federal statute; or
- Rules prescribed by the Supreme Court.

But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

The 1974 advisory committee notes recognize that state privilege law applies in diversity jurisdiction cases, but that federal privilege law controls in cases or claims arising under federal law. This Court's jurisdiction in this matter is based upon diversity of citizenship and as such Wyoming privilege law controls. Wyoming has enacted a series of statutes addressing hospital and physician quality assurance and improvement which limits disclosure of records. Plaintiffs have invoked these provisions herein and each must be addressed.

**A. Peer Review Privilege**

Powell has withheld some documents on the basis they are protected by peer review privilege [Doc. 124 pp. 4-8]. Wyoming law protects:

> All reports, findings, proceedings and data of the professional standard review organizations is confidential and privileged, and is not subject to discovery or introduction into evidence in any civil action, and no person who is in attendance at a meeting of the organization shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the proceedings of the organization or as to any findings, recommendations, evaluations, opinions or other actions of the organization or any members thereof. However, information, documents or other records otherwise available from original sources are not to be construed as immune from discovery or use in any civil action merely because they were presented during proceedings of the organization, nor should any person who testifies before the organization or who is

3

> a member of the organization be prevented from testifying as to matters within his knowledge, but that witness cannot be asked about his testimony before the organization or opinions formed by him as a result of proceedings of the organization.

W.S. § 35-17-105.

The Wyoming peer review statute was passed in March 1981. Laws 1981, ch. 107, § 1. Its passage came amidst a nationwide push to strengthen protections for peer review materials in hospitals, culminating with The Health Care Quality Improvement Act of 1986 (42 U.S.C.A. §§ 11111(a)(1)), which granted "immunity to professional review committees" and their members. George E. Newton II, *Maintaining the Balance: Reconciling the Social and Judicial Costs of Medical Peer Review Protection*, 52 Ala. L. Rev. 723, 732 (2001). Among the goals of the HCQIA was to combat the "increasing occurrence of medical malpractice" and "improve the quality of medical care" while addressing the "national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." Susan O. Scheutzow, *State Medical Peer Review: High Cost but No Benefit-Is It Time for A Change?*, 25 Am. J.L. & Med. 7, 18 (1999).

Today, nearly every state has a peer review privilege, reflecting a nationwide desire to curtail medical malpractice. Daniel M. III Mulholland; Phil Zarone, *Waiver of the Peer Review Privilege: A Survey of the Law*, 49 S.D. L.Rev. 424, 426 (2004). Medical peer review allows doctors to evaluate their colleague's work for compliance with industry standards. Christopher S. Morter, Note, *The Health Care Quality Improvement Act of 1986: Will Physicians Find Peer Review More Inviting?*, 74 Va. L. Rev. 1115, 1117 (1988). Having doctors evaluate their peer's performance is sensible given they are already familiar with the standards and regularly observe their colleagues in action. Newton II, *supra* at 723-25; Michael D. Benson, MD, FACOG et. al.,

*Hospital Quality Improvement: Are Peer Review Immunity, Privilege, and Confidentiality in the Public Interest?*, 11 Nw. J. L. & Soc. Pol'y 1, 7 (2016).

Before statutes mandating the practice were passed, doctors were generally reluctant to conduct peer review. Without a peer review privilege, "physicians who conduct peer review worry that negative comments about colleagues will be made public." Mulholland & Zarone, *supra* at 425. Peer review work "is not only time-consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity. If lawsuits by unhappy reviewees can easily follow any decision ... [peer review] will become an empty formality, if undertaken at all." *Scappatura v. Baptist Hosp. of Phoenix*, 584 P.2d 1195, 1201 (Ct. App. 1978). Doctors participating in peer review also fear "loss of pay for time spent participating, or the fear of reprisal in the form of loss of patient referrals." Newton II, *supra* at 727. For the peer review process to be effective it is required that the participants are assured their candor will be kept confidential.

Legislators sought to assuage doctors' fears by privileging peer review materials. With assurances that their comments will remain private, doctors can candidly perform peer review of their colleagues without fear of reprisal. Scheutzow, *supra* at 17-18; Nathaniel H. Hwang, *Defaming A Physician's Career the Double Edged Sword of Peer Review Privilege and Immunity*, 25 J. Legal Med. 95, 100 (2004). Peer review's confidentiality allows hospitals to audit their operations for quality and safety understanding that whatever they conclude cannot later be used against them. Scheutzow, *supra* at 19, 25. Others argue that the peer review privilege decreases the value of litigation to improve medical care and perpetuates the protection of medical providers. *Hide and Seek: Discovery in the Context of the State and Federal Peer Review Privileges*, 30 Cumberland Law Review 111 (2000).

Homeland argues the peer review privilege should not apply because their claim addresses insurance coverage for Powell and not the underlying malpractice claims for a doctor who left Powell over five years ago. Under these circumstances the reasons for the privilege do not apply and Powell is seeking insurance coverage for claims which implicate Powell's supervision and credentialing of Dr. Hansen. Homeland further asserts that the privilege is not absolute and that the materials withheld exceed the proper scope of the privilege.

Homeland's assertion that the privilege does not apply to the circumstances of this litigation is not supported within Wyoming statutes or case law. It is questionable that the legislature considered this exact type of proceedings when it enacted this privilege, but it could have allowed for some general exceptions to the privilege. The legislature did not do so. Rather, they established an absolute privilege designed to provide extraordinary protection to peer review proceedings.

As the court noted in *Greenwood v. Wierdsma*, the statute does not limit access to the facts, just the peer review proceedings. *Greenwood*, 741 P.2d at 1089. Homeland's desire to see these documents is understandable and they may contain relevant information, but the privilege was designed to protect and enhance the effectiveness of a peer review process which was deemed critical to ensuring the quality of health care delivered to the citizens of Wyoming. At this time, it does not appear that application of this privilege will deny Homeland the ability to prosecute its claim. In addition, this Court cannot say that the reasons for the privilege have dissipated. Those who participated in the peer review process did so with the belief that they could discuss and share information without disclosure to those who might take exception to their opinions and actions. The passage of time does not eliminate the potential for adverse impact upon those who participated in the review process. More importantly, it could have a chilling effect on

participation in future peer review processes if the participants fear future disclosure. Wyoming did not put a time frame on the privilege and as such it has not expired.

Homeland relies upon *Harston v. Campbell County Memorial Hosp.*, 913 P.2d 870 (Wyo. 1996) to argue that the privilege is not absolute. In *Harston*, a patient brought a medical malpractice action against the hospital which included claims for "failure to develop adequately and provide requirements for competency of surgeons in surgical treatment in the event that emergencies during surgery develop; failure to require appropriate pre-surgical testing; failure to manage, maintain, and require adequate maintenance of medical records documenting the events occurring during medical care at the hospital; and responsibility for the negligence of its employees, agents, representatives, and persons provided staff privileges." *Id.* at 872. The hospital objected and refused to produce discovery of information regarding other patients treated by the same doctor or related to the accreditation process in reliance upon W.S. § 35-2-606, 609 and W.S. § 35-17-105; § 35-2-910, 35-2-103; W.S. § 16-4-203(a). *Id.* The Wyoming Supreme Court noted that the peer review privilege was not absolute in that the statute expressly excludes the underlying information used in the peer review process with the language: "However, information, documents or other records otherwise available from original sources are not to be construed as immune from discovery or use in any civil action merely because they were presented during proceedings of the organization, nor should any person who testifies before the organization or who is a member of the organization be prevented from testifying as to matters within his knowledge, but that witness cannot be asked about his testimony before the organization or opinions formed by him as a result of proceedings of the organization." W.S. § 34-17-105. In so far at the hospital objected to the production of "health care information" pursuant to W.S. § 35-2-610, the court noted W.S. § 35-2-610(a)(ix) provided an express exception to the privilege which reads:

(a) Health care information shall not be disclosed by a hospital pursuant to compulsory legal process or discovery in any judicial, legislative or administrative proceeding unless:

...

(ix) A court has determined that a particular health care information is subject to compulsory legal process or discovery because the party seeking the information had demonstrated that the interest in access outweighs the patient's privacy interest."

*Harston* does not support Homeland's position that the peer review privilege is subject to the same exception. The dissemination of medical records is limited by W.S. §§ 35-2-605 et seq. The restriction upon disclosure is found in W.S. § 35-2-610. There is nothing in the Wyoming statutes to indicate that the exceptions contained within W.S. § 35-2-610 are intended to apply to any other privileges and the language of the statute indicates the exact opposite. The statute expressly limits the exceptions found in W.S. § 35-2-610 (a) to "health care information" which is defined in W.S. § 35-2-605(a)(vii) as "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and relates to the patient's health care, and includes any record of disclosure of that information." This is relevant to Powell's objections to discovery of medical records for non-party patients of Dr. Hansen, but not to the application of the peer review privilege.

Homeland is correct in noting that protecting materials from disclosure to insurance companies regarding coverage is not among the policy reasons cited for peer review statutes, including in Wyoming. There is a line of cases in New York where the courts "have compelled disclosure of peer review committee findings" where "the underlying policy of improving medical care was not implicated" including where an insurance company was defending a breach of contract claim. *Tartaglia v. Paul Revere Life Insurance Co.*, 948 F.Supp. 325, 329 (S.D. N.Y. 1996) and *Ryan v. Staten Island Univ. Hosp.*, 2006 WL 1025890, at *3 (E.D.N.Y. Apr. 13, 2006).

Other courts have held that the peer review privilege does apply to documents requested by an insurance company during a coverage dispute. *Doe v. UNUM Life Ins. Co. of Am.*, 891 F. Supp. 607, 609 (N.D. Ga. 1995). The *Doe* court couched their holding in part on the Georgia peer review statute's "exceedingly wide blanket of confidentiality." *Id.*

Much like Georgia, Wyoming's peer review statute provides ironclad protection to peer review materials. The Wyoming legislature could have, but did not, carve out any exceptions. It instead forbade the use of peer review materials in "any civil action." Doctors would face the same chilling effect if they knew their peer review materials were discoverable, regardless of the nature of the case which resulted in disclosure. It is the disclosure that creates the risk, not the nature of the court action. Wyoming, and the United States as a whole, has prioritized peer review, even at the expense of transparency. To allow the discovery of Powell's peer review materials in this case would directly contravene the statute's language and intent.[2]

While the law is clear that documents resulting from peer review are privileged, that protection does not extend to the independent discovery of a doctor's malfeasance. Otherwise, hospitals could shirk responsibility for any wrongdoing under the guise of peer review. The "privileged data does not include the materials reviewed by the committee, only those documents produced by the committee as notes, reports and findings in the review process." *Harston*, 913 P.2d at 875 (internal quotations omitted). The Wyoming peer review statute "was not intended to exempt from discovery all relevant information and thereby preclude the possibility of proving negligence." *Greenwood*, 741 P.2d at 1089 (*see also Nalder v. W. Park Hosp.*, 254 F.3d 1168, 1180 (10th Cir. 2001)(The Wyoming peer review statute "is not so broad as to encompass any

---

[2] This Court did allow the discovery of peer review materials in *Couch v. Board of Trustees of Memorial Hospital of Carbon County*, 2006 WL 8438281. This federal question jurisdiction case addressed the lack of a recognized federal peer review privilege and did not apply Wyoming statutory privileges.

document reviewed by professional standard review organizations."). Therefore, Powell must produce any documents that were not specifically created for or directly related to a peer review of Dr. Hansen. This includes any notes, documents or other pieces of evidence that may have been discovered during a review process that were not specifically created to aid in the review. Lacking context as to the creation of many of the disputed documents the Court is unable to specifically detail which documents are protected and which must be released. For that reason, the Court will need to conduct *in camera* review of some documents, as noted below. But the Court will reiterate W.S. § 35-17-105's language: "documents or other records otherwise available from original sources are not to be construed as immune from discovery ... merely because they were presented" during peer review proceedings.

While not fully briefed by the parties, there nonetheless exists a question as to whether the Wyoming peer privilege can be waived. Like most states, Wyoming's peer review privilege statute does not mention waiver. Mulholland & Zarone, *supra* at 435. To the Court's knowledge, the issue has not been litigated in Wyoming state courts. However, the decisions of other courts evaluating nearly identical peer review statutes are instructive in interpreting Wyoming's statute. *Id.* at 436-438. The Supreme Court of Georgia determined that its peer review statute, which read that peer review records "shall not be subject to discovery or introduction into evidence in any civil action" but made no mention of waiver, provided a "clear statutory mandate" for a "general embargo upon the discovery" of peer review documents. *Emory Clinic v. Houston*, 258 Ga. 434, 435 (1988). The Florida Court of Appeals held that its peer review statute, which forbids the "discovery or introduction into evidence in any civil or administrative action" of peer review documents, disallowed waiver of the privilege even when the disputed documents had been produced to third parties, because the "absolute immunity" of the statute could not be waived.

*Hillsborough Cty. Hosp. Auth. v. Lopez*, 678 So. 2d 408, 409 (Fla. Dist. Ct. App. 1996). See also: *Powell v. Community Health Systems, Inc.*, 312 S.W.2d 496, 513 (Tenn. 2010), and *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 806 N.W. 2d 282, 289 (Iowa 2011). Other courts have not found waiver of the privilege based upon a disclosure of the information. *Marshall v. Planz*, 145 F.Supp.2d 1258, 1273-74 (M.D. Ala. 2001), *Stewart v. Vivian, M.D.*, 2012 WL 195020 (Ohio Ct. App. 2012), and *Woods v. Moses Cone Health System*, 678 S.E.2d 787, 792 (NC 2009). Homeland relies upon a single unpublished case of *Connolly v. Labowitz*, 1984 WL 14131 (Sup. Ct. Del. 1984). That case held that, pursuant to Delaware statute and rules, that the privilege was held by the Credentials Committee and could only be waived by formal action of that committee. It does not support an implied waiver based upon a production of a document.

Wyoming's peer review statute is absolute upon its face and states that documents resulting from a peer review are "not subject to discovery or introduction into evidence in any civil action." W.S. § 35-17-105. That language is consistent with the Georgia and Florida statutes. And, like those statutes, the Wyoming peer review statute makes no mention of, or allows the possibility for, a waiver. The text of this statute strongly implies a policy against ready waiver of the privilege. Therefore, this Court cannot find that the the peer review privilege has been waived as a result of disclosure of a document.

This Court is not prepared to hold at this time that waiver of the peer review privilege is absolutely barred under Wyoming law, as extraordinary circumstances could arise where the interest of justice requires recognition of a waiver of the privilege and the structuring of procedures to balance the privilege with the necessity of disclosure.

## B. Medical Staff Committee Privilege

Powell has withheld some documents on the grounds they are protected by medical staff committee privilege [Doc. 124 pp. 3-8]. Wyoming law holds that "[a]ll reports, findings, proceedings and data of medical staff committees shall be confidential and privileged." W.S. § 35-2-609(d). However, that privilege is not absolute, and does not protect "the materials reviewed by the committee" but rather "only those documents produced by the committee as notes, reports and findings in the review process." *Greenwood*, 741 P.2d at 1089. The medical staff committee privilege was written in part "to prevent the staff committee's activities from providing the proof in civil actions against the hospital and physicians." *Id.*

As with the peer review privilege, the Court cannot parse which documents were produced by the committee as opposed to those that were merely reviewed by the committee. The Court will make clear, however, that any document related to Dr. Hansen's treatment that was not **specifically created by the committee** to assist in a review of his care is not protected under the Medical Staff Committee Privilege.

## C. Quality Management Function

Powell has withheld some documents on the grounds they are protected by quality management privilege [Doc. 124 pp. 4-5]. Wyoming law compels hospitals to "implement a quality management function to evaluate and improve patient and resident care and services in accordance with rules and regulations promulgated by the division. Quality management information relating to the evaluation or improvement of the quality of health care services is **confidential**." W.S. § 35-2-910(a) (emphasis added).

The statute does not designate such information as "privileged," but rather as "confidential." This is significant as the Wyoming legislature did apply privilege to some types

of medical review information, as discussed supra regarding peer review. Thus, this protection from disclosure is more nebulous than the peer review privilege and there is a paucity of case law explaining it. Still, the statute is clear that any documents resulting from the state mandated function for evaluating and improving Powell's health services are "confidential". This statute must be read in the context of the series of Wyoming statutes which are designed to protect the process, but not the facts which underlie the process. As such Powell cannot withhold every document that could be interpreted as evaluating and improving patient health. The statute characterizes the documents as "confidential", and thus the level of protection is substantially less than those which fall within a privilege. Courts routinely deal with confidential documents with protective orders and sealed filings. Confidential documents are not shielded from all discovery. Documents which were specifically produced by whatever quality control program Powell utilizes shall be treated as "confidential" and shall be produced in so far as they are not protected by a privilege and they address the relevant time frame.

### D. Board of Medicine Privilege

Powell has withheld some documents on the grounds they are protected by the Board of Medicine privilege [Doc. 124 pp. 8-9]. The Wyoming Board of Medicine consists of five physicians, one physician assistant and two lay members, appointed by the Wyoming governor by and with the consent of the Wyoming senate. W.S. § 33-26-201(a). The Board has the power to investigate and take disciplinary action against Wyoming physicians, including the ability to revoke a doctor's license to practice medicine in the state. W.S. § 33-26-202. Wyoming law protects from "discovery in any civil or administrative action" the

> Investigative notes, attorney's notes and work product and reports, pleadings, correspondence, witness statements and deposition transcripts and copies of original medical and prescription records in the possession of the board, whether acquired by the board, by any agent of the board or by any agency that has

cooperated with or provided information to the board regarding the investigation of a disciplinary docket.

W.S. § 33-26-408(f).

Documents "regarding complaints to the Board of Medicine ... [are] confidential and privileged." *Farnham v. Joubran*, No. 96509 (Wyo. 7th J. Dist., Jan. 18, 2016). "Final findings of fact, conclusions of law, orders of the board entered and any consent decree, stipulation or agreement to which the board is a party in any disciplinary docket of the board are public documents." § 33-26-408(c). The protected information in this matter is limited to the conduct of the Board.

It is unclear what involvement Dr. Hansen had with the Wyoming Board of Medicine. This privilege limits the production and discovery of information within the possession of the Board and it is unclear how it would apply to any information held by Powell. If Powell is in possession of such Board documents they can be withheld. As with the other privileges, it would not protect the underlying information which was provided to the Board. Accordingly, Powell must produce documents regarding factual information provided to the Board unless protected by another privilege. Homeland may seek information directly from the Board as to any documents which are public.

### E. Mediation Privilege

While Wyoming recognizes a mediation privilege (W.S. § 1-43-103), Homeland is actually asserting that there has been a waiver of statutory privileges as a result of disclosure during a mediation. Mediation proceedings were conducted under the rules of this Court and not pursuant to the Wyoming statute, but the state statute may provide guidance as to local practice. Homeland asserts that Powell has waived its objections as to some documents which had been previously produced to UMIA during the course of a mediation in this matter. In August 2017, Powell

engaged in a successful mediation with UMIA, who had provided insurance coverage to Powell after Homeland's policy lapsed. *Id.* This Court's Order for Mediation wrote that "no communication of any type, whether oral or written, or documents or information related in any way to the mediation, may be used by any party for any purpose, including impeachment, in any arbitration, judicial, administrative or other proceeding, and may not be disclosed to any non-party to the mediation" [Doc. 124-4 pp. 5-6]. Wyoming law keeps confidential any communication that is "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the mediation process." W.S. § 1-43-103(a). A "communication" is "any item of information disclosed during the mediation process through files, reports, interviews, discussions, memoranda, case summaries, notes, work products of the mediator, or any other item of information disclosed during the mediation, whether oral or written." *Id.*

Prior to the mediation, Powell disclosed to UMIA an email regarding Doctor Hansen that UMIA later shared with Homeland [Doc. 124-5]. Homeland argues it should be able to offensively use that email, and all other documents that were previously provided to UMIA, because Powell waived their privilege by providing them to UMIA [Doc. 120 pp. 10-11].

The record is unclear as to whether the email at issue, as well as other documents provided to UMIA, were done so to further the mediation process or as a separate discovery response. If produced in response to discovery requests, the email must be provided to Homeland, too, as "a discovery paper required to be served on a party" must be served on each party. Fed. R. Civ. P. 5(a)(C). But if the disputed email was provided in preparation for mediation, the Court's order and W.S. § 1-43-103(a) make clear than any documents exchanged retain their privilege. Accordingly, Powell is ordered to provide any documents it produced to UMIA as part of routine

discovery but is permitted to withhold all **privileged** documents that were provided to UMIA in furtherance of the mediation.

### F. Proportionality

Powell objects to some of Homeland's requests as overly broad [Doc. 124 pp. 9-10]. Specifically, Powell has refused to provide information on patients who are not party to the claims against Dr. Hansen, arguing such information is irrelevant and infringes on those patients' privacy. *Id.*

Homeland argues its discovery requests should encompass documents related to non-party patients because Homeland seeks to establish that Dr. Hansen was generally providing shoddy care [Doc. 120 p. 11]. Homeland's contract with Powell included a prior knowledge exclusion that denied coverage where the claim was "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving" an "act, error, omission, or Wrongful Act" [Doc. 1-1].

Within its broad discretion, the Court holds that documents related to non-party patients concerns about Dr. Hansen should remain undisclosed pursuant to W.S. § 35-2-610 (a). As noted above, this is not an absolute privilege and such information may be discoverable under those circumstances set forth in W.S. § 35-2-610. Homeland is permitted to seek such records within the exceptions set forth in the statute, but no such compliance has been shown as of this time.

While not specifically addressed in the briefing, it would appear that this objection would also relate to the date of the underlying information. The Homeland policy was effective August 1, 2013. Homeland asserts that the information sought is relevant to showing what Powell knew as of the inception date of the policy and which was not disclosed to Homeland. Homeland's meet and confer letter acknowledges this significance of the timing and offers to limit its discovery to

information prior to August 1, 2013, or to documents which address knowledge prior to that date. [Doc 120-6]. This would appear to be reasonable restriction considering the nature of the litigation. The Court will limit its inspection to documents dated prior to December 31, 2013.

### G. Privilege Log

Finally, Homeland request that Powell provide a "more detailed Privilege Log" [Doc. 120 p. 11]. In response, Powell claims Homeland never consulted with them on their objection. This Court "will not entertain any motions relating to discovery disputes unless counsel for the moving party has first conferred." U.S.D.C.L.R. 37.1(b). Based upon Homeland's meet and confer letter, Powell is mistaken. Homeland specifically requested that the privilege log be amended to provide specified additional information [Doc. 120-6 p. 7]. The information in the privilege log is in some respects insufficient to determine the suitability of the objection. Powell shall supplement their privilege log providing the information requested by Homeland in its meet and confer letter [Doc. 120-6] as to any documents dated prior to December 31, 2013, or for which no date is supplied, which Powell continues to assert objection to its production. It should be noted that many documents were withheld pursuant to the attorney-client privilege. Without additional information as to the circulation of such documents it is impossible to evaluate the validity of the objection.

This Court will conduct an *in camera* inspection of documents listed in the privilege log to determine the application of this order to those documents. This procedure is approved under these circumstances. *Harston*, 913 P.2d at 877. The list of documents to be reviewed is listed below. Any such documents which Powell elects to provide to Homeland after review of this order need not be submitted for review.

### H. May 7, 2013 E-mail from Tim Seeley to Bill Patten

This e-mail is addressed above as having been produced in discovery or pursuant to the mediation. This e-mail is identified on Powell's privilege log as PVH-022529 with noted objection of "Quality Management". This document has been filed herein under seal as document 120-5. It is difficult to see how this e-mail falls with the protection of quality management, other than broadly defining all documents which relate to problems with health care at Powell as quality management related. Nevertheless, as noted above, this is not a privilege. While this document may be considered confidential at this time, it is not privileged and could not be withheld from discovery. In that this document is already in the possession and available to all parties no further action by this Court is required.

### I. Conclusion

IT IS HEREBY ORDERED THAT:

1. Powell must provide all responsive documents which do not fall within the peer review privilege as defined herein;

2. Powell must provide all responsive documents which do not fall within the medical staff committee privilege as defined herein;

3. Powell must provide all responsive documents which are being withheld pursuant to its quality management function but such documents shall be treated as confidential;

4. Powell must provide all responsive documents which to not fall within the Board of Medicine privilege as defined herein;

5. Powell must provide all responsive documents that were provided to UMIA during routine discovery; AND

6. Powell is ordered to produce for in-camera review the following documents to the extent Powell continues to object to their production: PVH 003530-003540, 003581, 003723-003724, 003772, 003862-003863, 003996-003997, 004419-004441, 004513-004519, 004524-004530, 004612-004617, 004636-004636, 004649-004658, 004945-004954, 005013-005018, 006083-006085, 006435, 006601, 011000-011001, 011003-011004, , 011170-011171, 022529-022531, 025473-025474, 025484-025485, 025490-025505, 025521, 025524, 025530-025532, 030755, 030795-030802, 030833, 030841-030844,

076744-076771, 082181-082182, 082708-082735, and 120439-120442. In so far as any requested documents contain attorney-client privileged information Powell may redact such information.

Dated this 30th day of April 2019:

_____
Mark L. Carman
United States Magistrate Judge