# Exhibit M

*1*

IN THE DISTRICT COURT OF PARK COUNTY, WYOMING

FIFTH JUDICIAL DISTRICT

CIVIL ACTION NO. 27038

---

AARON L. HARRIS and GLENNDA P. HARRIS,

    Plaintiffs,

vs.

JEFFREY HANSEN, M.D.; and POWELL VALLEY HEALTHCARE, INC.,

    Defendants.

---

DEPOSITION OF SCOTT WILSON

4:02 p.m., Thursday
June 26, 2014

---

    PURSUANT TO NOTICE, the deposition of Scott Wilson was taken on behalf of the Plaintiffs in accordance with the applicable Wyoming Rules of Civil Procedure at Bonner Law Firm, 1102 Beck Avenue, Cody, Wyoming, before Anne Bowline, a Registered Merit Reporter and Notary Public of the State of Wyoming.

60

1  I'm -- I don't know. I guess I'm not understanding.
2     Q.   Sure. Let me see if I can break it down.
3  Did you study CRPS when you were in school to become
4  a PA?
5     A.   They called it RSD.
6     Q.   Reflex sympathetic dystrophy.
7     A.   It has changed definition. Yes, we learned
8  about it in school.
9     Q.   Okay. And they listed what the diagnostic
10 criteria of the signs and symptoms were; correct?
11    A.   Yes.
12    Q.   And probably in that textbook it had a
13 sentence in there somewhere that said, "You need to
14 rule out other possible causes before you make this
15 diagnosis"; correct?
16              MR. ORTIZ: Let me -- let me object on
17 foundation.
18              Go ahead if you remember what the textbook
19 said.
20    A.   I -- I guess I'll just have to say yes.
21 I'm not sure how else to answer.
22    Q.   (BY MR. KRAUSE) So now I need to ask you a
23 couple other questions. Let me start with, do you
24 know what Dr. Hansen's infection rate was when you
25 were working for him?

61

1     A.   I did not see a specific number for his
2  cases. I couldn't say a specific number or
3  percentage or number.
4     Q.   Did it seem high in comparison to what you
5  saw in -- for the orthopedic surgeons you worked for
6  in Oklahoma?
7     A.   Yes.
8     Q.   Did that concern you at all?
9     A.   Of course.
10    Q.   Did you ever report it or do any
11 investigation to try to determine what was causing
12 the high infection rate?
13    A.   Can we cut to the chase?
14    Q.   Sure.
15    A.   Okay. I presented many concerns about the
16 situation to certain individuals, and I'll give you
17 their names.
18    Q.   You will or will not?
19    A.   I will give you their names.
20    Q.   Okay.
21    A.   So the first one would be Rod Barton, who
22 was the CEO at the time of -- well, for the
23 predominance of my tenure. There was an interim, I
24 believe, at the end of my tenure. I also gave this
25 information of my concerns to -- jeez. He's a

62

1  vice --
2     Q.   Mike Gilmore?
3     A.   Thank you. Mike Gilmore. Those are the
4  only two people I can remember having specific
5  conversations with. But there were conversations
6  amongst other midlevels or other mid -- nursing,
7  et cetera, people about the issues.
8     Q.   Okay. What concerns of Dr. Hansen did you
9  share to Rod Barton?
10    A.   Choice of patients for surgical procedures.
11    Q.   Just a second. You said choice of patients
12 for --
13    A.   Procedures. It seemed that we repeatedly
14 took on patients with a high chance of poor
15 outcomes. That is from a physician assistant's
16 perspective. I'm not an orthopedic-trained
17 physician, so that would be my opinion. But it was
18 of such great occurrence that Dr. Hansen and I had
19 several conversations about what we should do and
20 what we shouldn't do. I also relayed my concerns
21 about total hip arthroplasty.
22    Q.   What was your concern about the total hip
23 arthroplasty?
24    A.   A disproportionate percentage of abnormal
25 alignments. When I raised this concern with Mike

63

1  Gilmore, it was towards the end of my tenure, and
2  Mike told me, "I guess we'll see."
3              Because I'd asked him, "We need to do
4  something. We need to try to intervene. We need to
5  try to help the situation, because I am seeing
6  several issues that are of great concern to me."
7  That became a wedge between Dr. Hansen and myself,
8  and I was essentially excused from practicing there
9  because of my concerns that I continually and
10 repeatedly raised.
11             There was some discussion of whether or not
12 I was appropriate with staff or whether I was
13 appropriate with patients. I did sign a piece of
14 paper that said that I was -- I struggled with the
15 staff. That was essentially a disagreement in the
16 way that the staff was managed versus the way that I
17 thought they should be managed.
18             I had no complaints of patients. I didn't
19 sign anything that said I had issues with patients.
20 They contacted me about two months ago and offered
21 me a job back to work there again.
22    Q.   Okay.
23    A.   What else would you like to know?
24    Q.   What other concerns you had with Dr.
25 Hansen. Tell me -- the first one was choice of

64

1  patients.
2  A. That's probably the biggest one, and Aaron
3  Harris is a perfect example of this.
4  Q. Based on your training as a PA -- and I
5  know you're not an orthopedic surgeon.
6  A. Thank you. Yes.
7  Q. You can't express an opinion on the
8  standard of care for an orthopedic surgeon. I'm
9  just asking you as a PA.
10  A. Yes, sir.
11  Q. Do you think Aaron Harris was an
12  appropriate patient for this type of surgery?
13  A. No.
14  Q. Why not?
15  A. As it was stated by Dr. Evans when he saw
16  him in follow-up once the referral, I guess, was
17  made by Dr. Hansen to Dr. Evans, he's a vasculopath.
18  He -- his comments were Dr. Chandler's notes from
19  12/7 of 2009, uncontrolled diabetic. He chose to
20  continue to smoke. He had all of the risk factors
21  for ischemic vascular disease and for CRPS.
22      These were the type of situations that were
23  of my -- that were of greatest concern during my
24  tenure underneath Dr. Hansen as my supervising
25  orthopedic physician.

65

1  Q. Do you remember having -- expressing those
2  concerns to Dr. Hansen specifically about Aaron
3  Harris before the surgery?
4  A. No.
5  Q. Did you express your concerns about his
6  choice of patients for procedures before February of
7  2010? In other words, did you have a discussion
8  with Dr. Hansen before February 2010 that you had
9  concerns about his choice of patients?
10  A. I do not recall a specific date, but yes.
11  A specific example would be he chose to do back
12  surgeries when I first worked for him, and I told
13  him, "I will not scrub cases that you choose to do
14  back surgeries on."
15  Q. Why was that?
16  A. I did not feel in my best interest that it
17  was safe for the patient or appropriate for us to be
18  doing those in the facility, because we did not have
19  the support staff for if something was to go wrong,
20  and he was an orthopedic hand specialist. Again,
21  that is from the reference point of the physician
22  assistant but using the experiential exposure to
23  other orthopedists who are very tight in what they
24  chose to perform.
25  Q. You had those conversations with Dr. Hansen

66

1  before February 2010; you just can't put a time
2  frame on it? Correct?
3  A. That is correct.
4  Q. Help me. You started working at Powell
5  when?
6  A. September of 2006.
7  Q. And you left --
8  A. November of 2010.
9  Q. Did you start having these conversations
10  with Dr. Hansen about your concerns close to the
11  beginning of your employment or the end?
12  A. It would be close to the beginning.
13  Q. Was it possibly sometime in 2007?
14  A. I can't say that, but it would have been
15  sometime towards the -- I feel more accurate to say
16  it was closer to the beginning than the end.
17  Essentially I quit saying anything towards the end.
18  Q. Any other concerns that you had with Dr.
19  Hansen?
20  A. Pertaining to the Aaron Harris case or --
21  Q. In general.
22  A. (No response.)
23  Q. You told me about his choice of patients,
24  the alignment for his total hip arthroplasties, and
25  then you said with the back surgeries.

67

1  A. Once you've had a conversation with someone
2  on three separate occasions about consumption of
3  inappropriate substances, whether or not that person
4  has been sent to a substance abuse program or not,
5  your concerns for continued use of substances are
6  always there.
7      After he returned from the treatment
8  center, I did not have any exposure or any time
9  frame that specifically made me concerned. But in
10  the back of your mind, it does play part of your
11  role. I mean, you ask somebody, "Are you inebriated
12  currently," and they say no, and indeed it comes out
13  they were later and I finish a case for the
14  individual because there's nobody else to finish the
15  case, then you're once bitten, twice shy to say the
16  least.
17  Q. So I got to ask you about this. Did you
18  ever see Dr. Hansen that you believed he was
19  impaired?
20  A. On three separate occasions.
21  Q. So I've got to ask you about those.
22  A. That's fine.
23  Q. Okay.
24  A. I'm good.
25  Q. And please -- I'm not -- I hope you don't

68

1  feel like I'm criticizing you in any way or
2  attacking you, because that's not my intent.  Do you
3  understand that?
4      A.   Off the record.
5           MR. ORTIZ:  There's no such thing.
6  Answer his questions.  Listen to the question he
7  asks.  Answer the question as best you can.  There's
8  no such thing as "off the record" when you're the
9  deponent.
10          THE DEPONENT:  Okay.  All right.  Fair
11 enough.  I didn't know that.
12     Q.   (BY MR. KRAUSE)  There is, but your lawyer
13 doesn't want you to say --
14          MR. ORTIZ:  Well, there's not, because
15 he could easily say, "Off the record you told me
16 this, Mr. Wilson, so let's talk about that."  You
17 don't get the confidentiality order from Bob Krause.
18          THE DEPONENT:  Okay.  On the record.
19     Q.   (BY MR. KRAUSE)  Okay.  Go ahead.
20     A.   I've lived through this shit for quite a
21 bit, and I'm good.  So there's no questions that are
22 off limits.
23     Q.   Okay.  Good enough.  I just want you to --
24     A.   And I do not feel like you're attacking me
25 or making me feel uncomfortable in any way.

69

1      Q.   Good.  So we were talking about the three
2  times that you said you believe you saw Dr. Hansen
3  impaired.
4      A.   I believe the first time I was contacted by
5  Andy Baker.  I do not recall the date or the year.
6  I came back -- I was actually in Cody.  I came back
7  to the hospital, and they had him in the clean
8  utilities room.  He was sitting there.  Glossy-eyed
9  and strange behavior.  He had just finished a case,
10 I believe.
11          And Andy and I both, as friends who went
12 fishing with him and went on trips with him and
13 spent a lot time with him, asked him.  We said,
14 "We're here to help."  And he denied consuming
15 anything, other than I think he said he took some
16 antihistamines or something.
17          The second time --
18     Q.   I'll just stop you and --
19     A.   Yes.
20     Q.   Based on your observations when you got
21 back to Powell, did you -- did Dr. Hansen appear
22 impaired to you?
23     A.   Yes.
24     Q.   Did you make any opinion as to what was
25 causing his impairment, if it was alcohol, drugs, or

70

1  anything --
2      A.   I didn't at the time, not with the first.
3      Q.   Good enough.  Second time?
4      A.   We were on an ER call.  There was a distal
5  radius fracture, straightforward, simple slam dunk
6  case.  And I came in, took the call, set it up, got
7  the -- got everybody organized.  It was early in the
8  evening, 8:00ish or 9:00ish or so.  And he came in
9  and was verbally inappropriate with the staff,
10 sexual connotations, way out of character for him.
11 Very reserved, very straight laced 90 percent of the
12 time.  So it caught my attention.
13          We essentially -- I could tell something
14 was amiss, and I confronted him about it.  And he
15 said he took an antihistamine.  I called his wife,
16 and she said, "Yeah, he took some cough medicine."
17 And we ended up canceling the case, and we did it
18 the next day.
19     Q.   Did it appear to you that he was more
20 impaired than just from taking some cough medicine
21 or some type of antihistamine?
22     A.   Can you give me a second?
23     Q.   Sure.
24     A.   Just a second.  I'll be right back.
25          (At 5:46 p.m., a break was taken

71

1  until 5:48 p.m.)
2      A.   It did appear that he was impaired that
3  evening.  I cannot say that I assumed it was any
4  substance over another.
5      Q.   (BY MR. KRAUSE)  Was it more impairment
6  than what you would expect in someone taking cough
7  medicine or an antihistamine?
8      A.   Yes.
9      Q.   Did you ever learn what was causing that
10 impairment?
11     A.   The third time that it occurred -- the same
12 behavior of sexual comments, inappropriateness,
13 distractedness during the procedure -- we were doing
14 a carpal tunnel -- excuse me -- a median nerve
15 debridement.  The patient had already had carpal
16 tunnel releases and had persistent pain.
17          We were in the middle of the case and it
18 seemed surreal, but the attending surgeon is
19 becoming more and more distracted, more and more
20 clumsy with utensils.  And I went on high alert, and
21 just about the moment that I was having -- I had no
22 training to know how to handle the situation.  He
23 had picked up the median nerve and was removing
24 tissue from the median nerve, and he placed the
25 scissors directly over the median nerve.

**Page 72**

1  I quickly removed the utensils from his
2  hand, asked him to leave, and I told him, "I got
3  it." He got up, stumbled out, and I finished the
4  last two pieces of tissue that I saw that needed to
5  be removed, because I've seen it a million times,
6  washed the patient up. I closed him up. I wrapped
7  him up. I took care of the postoperative orders. I
8  called the family, and I came home, called the CEO
9  of the hospital, and told him, "It's alcohol."
10  Q. How did you determine it was alcohol?
11  A. Gut instinct at that point. And I think it
12  was just because of the stupor of the behavior. It
13  was lethargic. It was clumsy. It wasn't hyper or
14  juiced like you would expect to see if someone was
15  on many of the other drugs. Of course, there are
16  other drugs that can make the same lethargic
17  behavior.
18      And I had been working with him all day
19  long and we were fine. I set the case up at 11ish,
20  and then as we continued through the process, found
21  out that he actually had started drinking early in
22  the morning and continued drinking throughout the
23  day. Once we finally -- Rod got involved, everybody
24  gets involved, everything's going, then he finally
25  confesses that, "Yes, I've been having trouble with

**Page 73**

1  drinking."
2      I know him personally. I knew him before I
3  went to work with him, and this process has plagued
4  him, unfortunately, for some time. He had attended
5  previous substance abuse programs. I think this
6  last one really did the job for him, and as a human,
7  I'm really proud of him for what he's accomplished.
8      So that is about all I got on that.
9  Q. How did you know him before you started
10  working with him?
11  A. He came down and worked for Dr. Biles when
12  I worked with Dr. Biles, and we would send cases and
13  scrub cases back and forth with him.
14  Q. Did Dr. Hansen ever admit to you that he
15  was abusing alcohol?
16  A. I confronted him on the phone, a very
17  heated discussion. And basically his remark was,
18  "Oh, I've got troubles."
19      Because I asked him, "How can we have a
20  working relationship when I ask you specifically and
21  you do not tell me the truth?"
22      And his response was, "Well, I have a
23  disease." That's when I confronted him about it,
24  and he did -- he did admit to it.
25  Q. Did these three incidents occur before

**Page 74**

1  Dr. Hansen went to rehab in 2008?
2  A. Yes.
3  Q. Did you report all three incidents to
4  either Rod Barton and/or Mike Gilmore?
5  A. I don't know if I did, but I believe that
6  one of us did, each of the three.
7  Q. When you had that phone call with Dr.
8  Hansen and you said it got heated when you
9  confronted him, did he say how long he had been
10  abusing alcohol?
11  A. I don't recall if he did or he didn't.
12  Q. Did you ever form an impression how long it
13  had been going on?
14  A. Looking back, I can -- I'm assuming it was
15  somewhere around the first of 2008, but that's a gut
16  feeling. I don't have any specific reason to think
17  that it is other than knowing that it started around
18  that time frame. The first incident was around that
19  time frame, so I guess I'd have to go off the fact
20  that it was the first incident. Maybe that's a
21  straighter answer.
22  Q. I'm going on memory, but I think he went
23  away for about three months to rehab in
24  Mississippi -- no. That was the first time.
25      MR. ORTIZ: Ten weeks, Lawrence,

**Page 75**

1  Kansas.
2      MR. KRAUSE: There we go. Thank you.
3  A. Yes, it was Kansas. I knew it was about
4  ten weeks, because I was trying to figure out all
5  the time, is someone going to come cover me? When's
6  someone going to come and help? Yeah, it was a long
7  ten weeks.
8  Q. (BY MR. KRAUSE) When he got back from that
9  rehab in 2008, did you ever have any concerns about
10  him and impairment? I'll ask you that first.
11  A. No.
12  Q. After he got back did you have concerns
13  about his choice of patients for procedures?
14  A. Yes.
15  Q. Did that continue the entire time you were
16  working there?
17  A. Yes.
18  Q. Did you know that Dr. Hansen received a
19  bonus based on his billings?
20  A. Yes.
21  Q. Did you ever have a concern that he was
22  doing high-risk procedures just to generate more
23  revenue so he could get a higher bonus?
24  A. That thought never occurred to me.
25  Q. Looking back now, do you think that was one

                                                                                                                      76
1  reason he was doing high-risk procedures?
2       MR. ORTIZ: Let me object. It calls
3  for speculation.
4       Go ahead.
5       A.   No. He doesn't have that type of
6  character.
7       Q.   (BY MR. KRAUSE) Do you know how many
8  procedures Dr. Hansen was doing a year?
9       A.   A ton. I don't know the number, but it was
10 a ton.
11      Q.   6, 700 sound about right?
12      A.   I never paid attention to what is normal or
13 abnormal for orthopedics; I just go to work. I
14 wouldn't know if that's high or low or medium.
15      Q.   Did it seem higher than the doctors you had
16 worked with in the past?
17      A.   No, I don't think so.
18      If I could, you'd asked me a question
19 about, do you think he was working -- or doing more
20 cases to generate revenue?
21      Q.   Yes.
22      A.   And I said it's not in his character. And
23 if I could, to clarify the statement of doing the
24 tough cases, he has a big, gigantic heart. He has
25 difficulty saying no, and he would take on the cases

                                                                                                                      77
1  that had legitimate complaints.
2       There was a real problem. Mr. Harris, he
3  has a real problem. He had foot pain. So these
4  cases were not -- we were not generating nor did I
5  ever feel that he was generating surgical cases just
6  to do surgical cases. I never saw him order and/or
7  perform a surgery that was not appropriate for the
8  said diagnosis.
9       To be very specific, it was the type of
10 patient that had the problem is my concern. If
11 somebody is a vasculopath and we're concerned and we
12 send them to have oxygen studies to see if it's a
13 viable limb, then it's a pretty high-risk patient to
14 do any extremity procedure on. That is what I mean
15 specifically.
16      Q.   Okay. When you have a high-risk patient
17 for vascular problems and you know that
18 preoperatively, you need to be very vigilant in
19 making sure they don't develop vascular problems
20 postoperative, don't you?
21      A.   Correct.
22      Q.   So let me get back when we got sidetracked.
23 Did you have concerns about Dr. Hansen's infection
24 rate?
25      MR. ORTIZ: I think it's been asked

                                                                                                                      78
1  and answered, hasn't it, Bob?
2       MR. KRAUSE: We got sidetracked. I
3  think he said he had concerns about a lot of things
4  that Dr. Hansen did, and we never got an answer to
5  the infection specifically, that I remember.
6       MR. ORTIZ: Yeah. He told you he
7  thought it was, and you asked him if he told
8  anybody, and he said yeah.
9       THE DEPONENT: I don't recall saying
10 that.
11      MR. ORTIZ: Oh, okay. That's what I
12 thought he said.
13      MR. KRAUSE: Overruled.
14      THE DEPONENT: Could we have --
15      MR. ORTIZ: Just ask the question.
16 I'm sorry. I thought he'd already answered it.
17 Just go ahead and ask him the question, Bob.
18      MR. KRAUSE: Sure.
19      Q.   (BY MR. KRAUSE) Did you ever report your
20 concerns about Dr. Hansen's infection rate to
21 anyone?
22      A.   No.
23      Q.   Did you believe based on working with Dr.
24 Hansen that he had a high rate of re-ops?
25      A.   Yes.

                                                                                                                      79
1       Q.   Did you ever attribute that to anything?
2       A.   That's a very complex question. Whew. I
3  think I would have to fall back to saying the choice
4  of patients. You're going to have need for more
5  debridements. People were sending us stuff that
6  they had already surgerized once or twice, and he
7  took on the complicated cases and chose to do them,
8  some of them appropriate.
9       Not every case was inappropriate. I don't
10 want somebody to think that. We just took on a lot
11 of complex things. When you have already been in
12 this body once and you've made an incision, each
13 time you make a successive incision, blood flow,
14 et cetera, et cetera, will be at risk.
15      As far as the surgical technique once we
16 were in the body, I don't believe it was his
17 surgical technique or his surgical -- in-time
18 surgical decision-making. I would say that it was
19 the quality of or concomitant diseases of the
20 patient profile that we had.
21      Q.   Other than what you've told me, did you
22 ever have any concern with Dr. Hansen's surgical
23 technique?
24      A.   The hip arthroplasty.
25      Q.   Other than what you've already told me.

###### 80

1  A.  I'm sorry. I was referencing my --
2  Q.  Yeah.
3  A.  I can't think of anything else.
4  Q.  So you attributed the high rate of
5 re-ops -- that's when you have to do a second
6 procedure on the patient; correct?
7  A.  That is correct.
8  Q.  -- more to his choice of patient as opposed
9 to surgical technique?
10  A.  Yes. And I know I've stated it before, but
11 again, this is from a general trained physician
12 assistant who has orthopedic experience. I would
13 not consider myself an expert witness on any of the
14 cases that he performed. That would --
15  Q.  Okay. Understood.
16  A.  Okay.
17  Q.  When you reported your concerns to Rod
18 Barton, did he ever say anything to you?
19  A.  I don't recall a specific conversation with
20 Rod other than he's always got this sense of "We'll
21 see" or "We're working on it" or something like
22 that. I never got a definitive "Here's a plan of
23 action" from Rod.
24  Q.  How about when you spoke to Mike Gilmore?
25  A.  He basically brushed me off and told me,

###### 81

1 "We'll see. We'll see if you're right or not."
2       And I said -- and I said, and I quote, "You
3 will see a definite change in the number of issues
4 that arise when I leave."
5       It would -- and his response was, "We'll
6 see."
7       And my response was, "What if this was one
8 of your family members, Rod? We need to do
9 something." Excuse me. Mike. "We need to do
10 something. He needs help. We need to find some
11 type of a plan of action."
12  Q.  Did this conversation occur in 2008?
13  A.  That occurred in 2010, somewhere probably
14 around September. It was a declining relationship
15 from August, September, October, into November, when
16 eventually I begged him if I could just let my four
17 weeks go and please just let me leave. And he
18 agreed.
19  Q.  So you have subsequently learned that Dr.
20 Hansen did have his privileges suspended; correct?
21  A.  Privileges to perform surgery at West
22 Park -- I mean Powell hospital?
23  Q.  Yes.
24  A.  I do know that, yes.
25  Q.  And you learned that he eventually resigned

###### 82

1 just recently?
2  A.  I didn't know that, no.
3  Q.  You didn't see that in the paper?
4  A.  No.
5  Q.  Okay. He's resigned.
6  A.  Okay.
7  Q.  Did you see any of the articles in the
8 paper that he had -- was suspended in 2013?
9  A.  I saw the comment about how much money
10 they're losing and the fact that he's no longer
11 there. I mean, that's all that I saw. It was about
12 a week or so ago. That's all I remember seeing.
13  Q.  You don't have any knowledge as to why his
14 privileges were suspended at Powell hospital, do
15 you, in 2013?
16  A.  I consider that each of them would be
17 scuttlebutt. Is that the term? Hearsay from other
18 observers.
19  Q.  That's fine. What did you hear?
20  A.  Because of why we're here today: numerous
21 complications.
22  Q.  Did you ever hear anything that it was
23 related to impairment?
24  A.  No, I didn't.
25  Q.  Did you ever have any other conversations

###### 83

1 with anyone else about your concerns about Dr.
2 Hansen?
3  A.  Andy Baker, Chris Hoellwarth -- I had them.
4 They were rolling off my tongue, the CRNAs. Those
5 are the only ones that I know specifically as far as
6 other providers. I can't say that there was anyone
7 else involved in the conversation.
8  Q.  Before I forget, I don't think -- the notes
9 that you made based on your chart review before the
10 deposition we marked as Exhibit 14; correct?
11  A.  That is correct.
12  Q.  Okay. I just don't think I identified it
13 and I just wanted to.
14       What conversations did you have with Chris
15 Hoellwarth?
16  A.  General recollection would have been around
17 the impairment time, 2008.
18  Q.  Did Chris share with you any concerns that
19 he had with Dr. Hansen? Did he say, you know, "I
20 saw him impaired too," or anything like that?
21  A.  I can't say that specifically. I just
22 remember general conversation of concern, but I
23 don't remember him saying specifically he saw or
24 didn't see anything.
25  Q.  How about your conversations with Andy