# Exhibit D

*1*

IN THE DISTRICT COURT OF PARK COUNTY, WYOMING

FIFTH JUDICIAL DISTRICT

CIVIL ACTION NO. 27038

---

AARON L. HARRIS and GLENNDA P.
HARRIS,

       Plaintiffs,

  vs.

JEFFREY HANSEN, M.D.; and POWELL
VALLEY HEALTHCARE, INC.,

       Defendants.

---

DEPOSITION OF WILLIAM PATTEN

9:12 a.m., Wednesday
June 25, 2014

---

      PURSUANT TO NOTICE, the deposition of
William Patten was taken on behalf of the Plaintiffs
in accordance with the applicable Wyoming Rules of
Civil Procedure at Powell Valley Hospital, 777
Avenue H, Powell, Wyoming, before Anne Bowline, a
Registered Merit Reporter and Notary Public of the
State of Wyoming.

A P P E A R A N C E S

For the Plaintiffs:        MR. ROBERT A. KRAUSE
                           Attorney at Law
                           The Spence Law Firm, LLC
                           15 South Jackson Street
                           P.O. Box 548
                           Jackson, Wyoming  83001

For Defendant Jeffrey      MR. CHRISTOPHER C. VOIGT
Hansen, M.D.:                        and
                           MR. ERIC PETERSON
                           Attorneys at Law
                           Crowley Fleck, PLLP
                           500 Transwestern Plaza II
                           490 North 31st Street
                           P.O. Box 2529
                           Billings, Montana  59103

For Defendant Powell       MR. SCOTT E. ORTIZ
Valley Healthcare,                   and
Inc.:                      MR. BRIAN J. MARVEL
                           Attorneys at Law
                           Williams, Porter, Day &
                                Neville, P.C.
                           159 North Wolcott Street
                           Suite 400
                           P.O. Box 10700
                           Casper, Wyoming  82602

*3*

I N D E X

<u>DEPOSITION OF WILLIAM PATTEN</u>                    <u>PAGE</u>

EXAMINATION
By Mr. Krause                                          4

E X H I B I T S

<u>IDENTIFIED</u>

3    Plaintiff's Notice to Take the            5
     Rule 30(b)(6) Deposition of Powell
     Valley Healthcare, Inc., dated
     6/19/2014 (5 pages)

4    Letter dated 6/3/2008 to Jeff             71
     Hansen, M.D., from Sharon
     Christensen (2 pages)

5    Employment Agreement dated                73
     6/13/2008 (7 pages)

6    W-2 Wage and Tax Statement,               --
     2010 (1 page)

*92*

1 the way Dr. Hansen practiced medicine, his infection
2 rate, reoperates, you know, anything relating to his
3 competence as a physician or patient care issues?
4    A.   My sense is that all of that over the last
5 few months has been within one of the categories
6 that he doesn't want me to talk about.
7    Q.   What about at any time?  I'm not limiting
8 it to just the last few months.
9    A.   So my first year here there would have been
10 very little communication of that type.  My second
11 year, from the point that Brad Mangum brought
12 forward some concerns, my sense is that almost
13 everything would fall into those categories.
14    Q.   Okay.  And when you say "almost
15 everything," that's what I want to know, the
16 "almost" part of it.
17    A.   Well, I'm reluctant to speak in absolutes
18 because I don't want to have one or two that fall
19 out, but I can't think of the one or two that would
20 have fallen out.
21    Q.   Okay.  And again, I think you limited it to
22 just the last few months.  You said there would be
23 very little during your first few months of
24 employment.
25    A.   The first year.

*93*

1    Q.   First year.  So do you remember any during
2 the first year that would not be what you consider
3 privileged?
4    A.   None come to mind, no.
5    Q.   Do you need a break?
6    A.   I'm good.
7         MR. KRAUSE:  Anyone else?
8         MR. ORTIZ:  How much more do you have?
9         MR. KRAUSE:  I'm wrapping up.
10         MR. ORTIZ:  Let's just stretch for a
11 few minutes.
12         (At 11:38 a.m., a break was taken
13 until 11:48 a.m.)
14         (Mr. Voigt is not present.)
15         MR. KRAUSE:  Back on the record.
16    Q.   (BY MR. KRAUSE)  I want to finally get back
17 to the notice of deposition, which we marked as
18 Exhibit 3.  Let me make sure I get the areas right.
19 I think you were designated for 3, 16, and 17.
20         MR. ORTIZ:  9, 16, and 17.
21         MR. KRAUSE:  Right.  9, 16, and 17.
22         MR. ORTIZ:  Let me get back up there.
23    Q.   (BY MR. KRAUSE)  What documents or
24 information were presented to PVHC in connection
25 with Dr. Hansen getting privileges here?

*94*

1    A.   Originally?
2    Q.   Yes.  Do you know?
3         MR. ORTIZ:  Which one are you looking
4 at?
5         MR. KRAUSE:  Number 9.
6         MR. ORTIZ:  Well, you're asking him
7 about privileges; this is asking about suspensions
8 and revocations.
9         MR. KRAUSE:  Yeah.  That's privileges.
10         MR. ORTIZ:  Okay.  I heard the
11 question differently.
12    A.   I wasn't here at the time.  I would assume
13 it would be the application for membership, and then
14 we would have had to produce -- it's called primary
15 source verification for the prior employment, the
16 medical education, the residency training, all of
17 that sort of thing.
18    Q.   (BY MR. KRAUSE)  What other documents?
19         MR. ORTIZ:  And let me just object.
20 It's been asked and answered earlier today about
21 what was in the credentialing process.
22         But go ahead with that.
23    A.   Yeah.  So as far as what he would have
24 produced?  I just want to make sure I understand
25 what --

*95*

1    Q.   (BY MR. KRAUSE)  What he produced or what
2 documents you would have gotten.
3    A.   We would have done all of the primary
4 source verification.  We would have done the
5 National Practitioners Databank query.  We would
6 have asked for documentation from him related to any
7 malpractice cases he had or any issues related to
8 substance abuse.  He would have had to produce
9 documentation for all of that.
10         (Mr. Voigt entered the room.)
11    A.   That would be a summary.  I mean, I may be
12 overlooking something specific but in general terms
13 that's what --
14    Q.   (BY MR. KRAUSE)  I may have asked you this.
15 If I did, I apologize.  Do you still have the
16 original file relating to him getting privileges?
17         MR. ORTIZ:  We told you, Bob, already.
18 We produced it to you with the privilege log.
19         MR. KRAUSE:  Oh, okay.
20    Q.   (BY MR. KRAUSE)  What steps do you have to
21 go through in order to suspend or revoke a
22 physician's privileges?
23         MR. ORTIZ:  Let me object to the
24 extent it's overly broad and incomplete.
25         But go ahead and summarize.

96

1      A.   So the medical staff bylaws define a couple
2   of different mechanisms by which physician
3   privileges are suspended.  So certain committees can
4   take that action, chief of staff can take that
5   action, and the CEO could take that action.  And it
6   depends on the nature of the concern, whether the
7   action is considered summary in nature, you know,
8   "You have to stop practicing right now," and then we
9   have a hearing within five days or whether it's
10  something that there's a notice and then you get to
11  have the hearing.
12     Q.   (BY MR. KRAUSE)  Would any of those issues
13  dealing with suspension be related to patient care
14  are issues?
15          MR. ORTIZ:  Are you be asking in
16  general?
17          MR. KRAUSE:  Yes.
18     A.   That's one of the categories, yes.
19     Q.   (BY MR. KRAUSE)  What are the other
20  categories that a physician could have his
21  privileges suspended?
22     A.   Issues related to licensure, to
23  certification, DEA status, all of the qualifications
24  to be a physician in practice.  That would be one
25  category.  Quality of care.  You can also have

97

1   interpersonal issues.
2      Q.   Okay.  Let me limit it to patient care
3   issues.
4      A.   Okay.
5      Q.   How's that?  What committees can suspend a
6   physician's privileges for patient care issues?
7      A.   So I think the surgery committee can.
8      Q.   Which one?
9      A.   Surgery committee.  Med exec.  With the
10  rewrite of the bylaws, I don't remember whether
11  credentials would be, because I don't think these
12  are typically the issues that go to credentials.  So
13  I think it would be surgery committee, med exec, and
14  then professional practice evaluation committee.
15  But I'm not sure whether they make the
16  recommendation or whether they actually have the
17  authority to do it.
18     Q.   The surgery committee, which steps do they
19  have to go through before they can suspend a
20  physician's privileges?
21     A.   My recollection is it's not very well
22  defined.  I think it just says that they have the
23  authority to do it, but it doesn't say you have to
24  have three meetings or have this many cases.  I
25  don't think there's that level of detail in the

98

1   bylaws.
2      Q.   So if they had a patient care issue
3   concerned with a physician, they could vote to
4   suspend his privileges?
5      A.   That's my understanding, yeah.
6      Q.   Okay.  You used the term "medical executive
7   committee"?
8      A.   Yeah.
9      Q.   Okay.  Just so the record's clear.
10          What steps does the medical executive
11  committee need to go through to suspend a
12  physician's privileges for patient care issues?
13     A.   It would be the same answer.  I don't think
14  our bylaws define a specific process.  It's just
15  when, in their opinion, the concern rises to that
16  level.
17     Q.   And then you said the --
18     A.   Chief of staff.
19     Q.   No, you gave other committee.  The PPE?
20     A.   Professional practice evaluation committee.
21  And there I questioned whether they actually have
22  the authority to suspend or whether they just
23  recommend suspension.  I'm not sure where they stand
24  in the process.
25     Q.   Then the second one that I wrote down was

99

1   chief of staff.
2      A.   Correct.
3      Q.   Do you know who the chief of staff was in
4   2010?
5      A.   '10?  I'm not certain.  I believe it was
6   Dr. Chandler, but I'm not certain --
7      Q.   Okay.
8      A.   -- as I wasn't here then.
9      Q.   Do you know what steps the chief of staff
10  has to go through to suspend a physician's
11  privileges for a patient care issue?
12     A.   Same answer.  I don't think that our
13  processes are specific.
14     Q.   So he can make that decision solely on his
15  own?
16          MR. ORTIZ:  Let me object on
17  foundation.
18          Go ahead if you know.
19     A.   That's my understanding of the bylaws.
20     Q.   (BY MR. KRAUSE)  Okay.  And then the CEO
21  you said was the third one.
22     A.   Yes.
23     Q.   And at least presently that's you?
24     A.   Yes.
25     Q.   And in 2010 I think it was Rod Barton.

*100*

1  A.   Yeah.  I don't know whether that was Rod or
2  it could have been Robyn.  So when Rod left, there
3  were interim CEOs before Paul took over.
4  Q.   Okay.
5  A.   And Robyn served at some point.  I think it
6  was a seven- or eight-month window where Robyn was
7  interim CEO.
8  Q.   And what's Robyn's last name?
9  A.   Rolling.
10  Q.   Are there any steps that you have to go
11  through as the CEO to suspend a physician's
12  privileges for patient care issues?
13  A.   Not as outlined in -- again, it's the same
14  answer.  I don't think that the bylaws are specific
15  as to process.
16  Q.   Let me ask you your understanding.  If a
17  physician came to you with a patient care issue
18  related to another physician and you believed that
19  report was credible, could you at that moment
20  suspend the other physician's privileges?
21  A.   Your choice of word, "could," yes I could.
22  Q.   I just want to make sure.  Your
23  understanding is you have that authority to do it?
24  A.   Yes.
25  Q.   If you chose not to exercise that authority

*101*

1  and wanted to do more investigation, is there any
2  procedure laid out in the bylaws or anywhere that
3  would define what you should do?
4  A.   I don't believe there's that level of
5  detail, no.
6  Q.   So you have a lot of discretion in saying,
7  "No, I want to talk to the other physician first,"
8  or, "I want other physicians to look into it," or
9  whatever?
10  A.   Is this personal between the two
11  physicians?  Yes.
12  Q.   You have gone back and reviewed the
13  financial statements for Powell Valley Healthcare
14  from prior years even before you started working
15  here; correct?
16  A.   Correct.
17  Q.   And I think you told me in your last
18  deposition that as part of your -- I'll call it
19  review process in deciding whether you wanted to
20  work here, you reviewed their financial results for
21  several years?
22  A.   That's correct.
23  Q.   And I also saw a newspaper article recently
24  that quoted you as saying that Dr. Hansen was a real
25  workhorse.

*102*

1  A.   That's correct.
2  Q.   Was that an accurate quote?
3  A.   Yes, it was.
4  Q.   Okay.  Would you agree with me that back in
5  2010, Dr. Hansen was generating approximately half
6  the revenue for this hospital?
7  A.   I would not agree with that.
8  Q.   Do you know what percentage of the revenue
9  of the hospital he was generating?
10  A.   No.  But half would -- just off the top of
11  my head, that's a big number.  I wouldn't expect a
12  single doctor to produce that much.
13  Q.   And I'm using that based on what he
14  actually produced himself and, you know, what you
15  bill for the operating room and the postop care and
16  everything like that relating to Dr. Hansen's
17  patients.  That might be a better way to phrase it.
18  A.   And I'm not meaning to -- so you said
19  "hospital."  So Powell Valley Healthcare is a
20  nursing home, hospital, clinics, home health,
21  hospice, and ambulance.  So if I only look even at
22  just the hospital portion, I would be surprised that
23  Dr. Hansen would make up half of the hospital
24  revenue.
25  Q.   Even if you consider what his, quote,

*103*

1  patients generate?
2  A.   Yes.
3  Q.   Do you know what the percentage was for
4  what he generated?
5  A.   No.
6  Q.   Would you be able to track that
7  information?
8  A.   I could pull that.  For your clarification,
9  we're a $70 million business, and to suggest that a
10  single doc is doing half of that. . .
11  Q.   Let me ask you this:  At 70 million, what
12  percentage -- what number of that is just the
13  hospital, putting aside the nursing home and
14  everything else?
15  A.   That's the piece I don't know off the top
16  of my head.
17  Q.   When you used 70 million, you were
18  encompassing everything?
19  A.   Powell Valley Healthcare, yeah.
20  Q.   Would you agree that Dr. Hansen was the top
21  revenue-generating physician at the hospital?
22  A.   Yes.
23  Q.   Would you also agree that he did more
24  surgeries than any other physician?
25  A.   Yes.

*104*

1    Q.   Give Mr. Ortiz a chance to object before
2  you answer or say anything.  Did you, as the CEO,
3  ever consider suspending Dr. Hansen's privileges?
4  Give him a minute to think about it.
5          MR. ORTIZ:  Yeah.  I think -- I think
6  just generally that question you can answer yes or
7  no.
8    A.   Yes.
9    Q.   (BY MR. KRAUSE)  When did you first
10  consider that?
11          MR. ORTIZ:  You can answer that as
12  well.
13    A.   I believe it would have been in November of
14  '13.
15    Q.   (BY MR. KRAUSE)  Do you have the authority
16  to terminate a physician?
17          MR. ORTIZ:  Just in general, you're
18  asking?
19          MR. KRAUSE:  Yes.
20          MR. ORTIZ:  Yeah.  Go ahead.
21    A.   The contract has options, and I would have
22  the authority to exercise the options within the
23  contract, yes.
24    Q.   (BY MR. KRAUSE)  Do you have to get
25  approval from anyone to terminate a physician?

*105*

1    A.   Have to, no.  Would I typically --
2  "approval," I probably wouldn't use that word, but I
3  would involve others unless there was something that
4  was so emergent that I didn't have time to consult.
5  Discharging a physician is a pretty big deal, and I
6  would make sure that I consult appropriate other
7  folks.  But from an authority perspective, yes, I
8  would have the authority.
9    Q.   Who would you consult?
10    A.   Depending on the physician, chief of staff,
11  medical director of the clinics, department chair
12  for that specialty, board chair.  Those would be
13  folks that I would first try to talk with.
14    Q.   As the CEO -- and again, give Mr. Ortiz a
15  minute to think and object if he wants to -- did you
16  ever consider suspending Dr. Hansen?
17          MR. ORTIZ:  You can answer that yes or
18  no.
19    A.   Yes.
20    Q.   (BY MR. KRAUSE)  And what decision did you
21  make?
22    A.   I did not.
23    Q.   You decided it was not warranted?
24          MR. ORTIZ:  I don't know that
25  without -- if you can answer that without getting

*106*

1  into the information that you relied on, then answer
2  it.  But if you can't, I think it's privileged.
3    A.   So did I decide it was not warranted?  No.
4  We as an organization chose to take a different
5  approach.
6          MR. KRAUSE:  And I'm assuming that
7  approach you're going to claim privilege on.
8          MR. ORTIZ:  Yeah.  And I think we've
9  objected to the documents.
10    Q.   (BY MR. KRAUSE)  Okay.  Did you ever
11  consider terminating Dr. Hansen?
12          MR. ORTIZ:  You can answer that yes or
13  no.
14    A.   Yes.
15    Q.   (BY MR. KRAUSE)  And I assume you decided
16  not to terminate him; is that correct?
17          MR. ORTIZ:  Answer as best you can
18  without getting into what the reliance was and all
19  that other stuff.
20    A.   So I chose to pursue a different path that
21  would result in separation but would not be
22  classified as a termination.
23    Q.   (BY MR. KRAUSE)  Okay.  But did you ever
24  decide that you should terminate Dr. Hansen?
25          THE DEPONENT:  So I'm --

*107*

1          MR. ORTIZ:  Yeah.  Go ahead.
2    A.   I anticipated that I might need to.  We
3  never reached the point in time where I had to
4  finalize that decision.
5    Q.   (BY MR. KRAUSE)  Would it be fair to say
6  that you gave Dr. Hansen the option of either
7  resigning or being told that he would be
8  terminating -- terminated if he did not?
9          MR. ORTIZ:  I'm going to advise you
10  not to answer that question.
11          And, Bob, it's in all -- there's logs as to
12  all that went back and forth, and I'll just tell you
13  it deals with a lot of attorney-client issues.  It
14  deals with a number of issues under the confidential
15  suspension termination proceedings of the bylaws.
16  So I can't open that door and have him start
17  explaining what they did without getting into all
18  those issues.
19          MR. KRAUSE:  I'm not asking him to
20  explain.  I just want to know if he, as the CEO,
21  ever presented Dr. Hansen with the option of either
22  resigning or being terminated.
23          MR. ORTIZ:  I understand, but it all
24  is part of the same process that was on going, and
25  so I don't think I can let him get into that issue.

*108*

1   Q.   (BY MR. KRAUSE)  I assume you're going to
2   follow your attorney's advice.
3   A.   I am.
4   Q.   What information, documents, or records
5   were presented to PVHC in connection with Dr. Hansen
6   resigning from the corporation?
7          MR. ORTIZ:  I think -- I think what
8   you can -- how you can answer that would be to
9   generally describe the categories of documents that
10  were relied upon as you looked at suspension or
11  potential termination.  So I think just giving
12  categories of documents would be as far as you could
13  go on that.
14          THE DEPONENT:  Okay.  So -- well, I'll
15  say what happened, and you stop me if I'm saying
16  what I shouldn't say.
17  A.   So his privileges were suspended by Dr.
18  Lengfelder.  As required by medical staff bylaws,
19  med exec met, had a hearing with him, did not yet
20  have results of external peer review, and so lifted
21  the suspension.  Two days later, after having
22  received the peer review, med exec met again,
23  reinitiated the suspension.  So that was end of
24  November-ish.
25  Q.   (BY MR. KRAUSE)  So let me start you there

*109*

1   if I can.  You would have gotten some documents from
2   the -- did you call it external peer review?
3   A.   Uh-huh.
4          MR. ORTIZ:  "Yes"?
5   Q.   (BY MR. KRAUSE)  Is that correct?  You have
6   to say "yes."
7   A.   Yes.
8   Q.   What documents did you get?
9          MR. ORTIZ:  And all you can do is just
10  categorize what the --
11  Q.   (BY MR. KRAUSE)  Don't tell me -- I'm not
12  asking you to tell me what was contained or who
13  authored those documents.  I just want to know
14  what -- what type of documents they were.
15  A.   They would have been external peer review
16  write-ups on specific patients of Dr. Hansen's.
17  Q.   Let me see if I -- you would send patient
18  charts to another physician outside of the
19  organization, ask them to review it and report back
20  to you whether they thought the care was appropriate
21  or not; is that --
22          MR. ORTIZ:  Well, I'm not going to let
23  him get into the specifics of what was requested in
24  this case.
25          You can generally describe what external

*110*

1   peer review is.
2   A.   So your summary would be accurate.
3   Q.   (BY MR. KRAUSE)  Okay.  Then you said after
4   November of -- any other documents that you would
5   have gotten in connection with the initial
6   suspension?
7   A.   So the letters communicating between chief
8   of staff, Dr. Lengfelder, and Dr. Hansen; the
9   subsequent letter from med exec to Dr. Hansen
10  lifting the suspension; and then two days later the
11  letter from med exec initiating the suspension
12  again.
13  Q.   Any other documents?
14  A.   So that takes us through the end of
15  November.
16  Q.   And I mean up to that point were there any
17  other documents that you had gotten in connection
18  with suspending Dr. Hansen's privileges?
19  A.   Not other than any ongoing work from the
20  PPEC, the peer review-type documents.
21  Q.   Okay.  So keep going, then.
22  A.   So the PPEC continued its work doing
23  investigation into specific care-related topics.  By
24  the later part of December, med exec met and
25  determined --

*111*

1          MR. ORTIZ:  Okay.  The determinations
2   of what med exec did I don't want you to talk about.
3   You can say that they met and move forward.
4   A.   Okay.  They met --
5   Q.   (BY MR. KRAUSE)  Did they -- did they have
6   any other documents to review when they met?
7   A.   PPEC had written a letter to med exec.
8   Q.   And for purposes of the record, can you try
9   to use the formal name so it's --
10  A.   Professional practice evaluation committee.
11  Q.   Okay.  What other documents did they have
12  or information?
13  A.   So they would have all of the peer review
14  protected documents, and they produced a letter
15  summarizing their findings and recommendation to the
16  med exec.
17  Q.   Med exec, formal name?
18  A.   Medical executive committee.
19  Q.   Okay.  Good.  Keep going.
20  A.   So medical executive committee would have
21  reviewed the recommendation from the professional
22  practice evaluation committee and would have made
23  their own determination.
24          MR. ORTIZ:  That's as far as you can
25  go on that.

112

1    Q.   (BY MR. KRAUSE)  Would the medical
2   executive committee have had any other documents or
3   information?
4    A.   Other than what they received from
5   profession professional practice evaluation
6   committee, no.
7    Q.   Okay.  Keep going.
8    A.   So medical executive committee met, made
9   their recommendation.  Based on that recommendation,
10  certain responsibilities as defined by the bylaws
11  were carried out.  That would require notifications,
12  that sort of thing.  And it was at that point
13  that -- and I think this goes back to your original
14  question about firing, and it was at that point that
15  I felt like I was going to have to make that
16  decision or not.
17   Q.   As I understand, you never made a final
18  decision; correct?
19   A.   Right.  We chose a different course.
20   Q.   At that point did you have any other
21  documents, other than what you've told me about --
22   A.   No.
23   Q.   -- to make your decision?
24   A.   No.
25        MR. ORTIZ:  Did you -- did you have

113

1   outside counsel by then?
2        THE DEPONENT:  Oh, we had numerous
3   meetings with out counsel.
4        MR. ORTIZ:  So he also is asking if
5   you had privileged communications from lawyers.
6    A.   Yes, multiple phone calls and letters.
7    Q.   (BY MR. KRAUSE)  And without telling me
8   what was said, did you -- in connection with any of
9   those investigations, did any of the committees or
10  yourself talk to Dr. Hansen?
11   A.   As required by the bylaws, Dr. Hansen would
12  have been involved in a couple of hearings where he
13  had the opportunity to meet with the professional
14  practice evaluation committee and with the medical
15  executive committee.
16   Q.   And would you also have interviewed other
17  health care providers that you thought had pertinent
18  information?
19   A.   Me personally?
20   Q.   Or the committees.
21   A.   By that point my sense is most of the
22  interviews had already been accomplished, had
23  already taken place.
24        MR. KRAUSE:  And then I think as to
25  the areas you've been designated, that's all the

114

1   questions I have for you.
2        THE DEPONENT:  Okay.
3        MR. KRAUSE:  So thank you again for
4   coming in.
5        I don't know if anyone else has any
6   questions.
7        MR. ORTIZ:  No.  We'll reserve
8   everything.
9        And we'll ask him to read and sign, Anne.
10       (The deposition proceedings were
11  concluded at 12:18 p.m., June 25, 2014.)

115

1   DEPONENT'S CERTIFICATE
2        I, WILLIAM PATTEN, do hereby certify that I
3   have read the foregoing transcript of my testimony
4   and that the same is a full, true, and correct
5   record of my deposition except as to any corrections
6   I have listed on the Amendment to Deposition Form.
7
8   _____ Changes and corrections made.
9   _____ No changes or corrections made.
10
11
12
                 _____
13
                 WILLIAM PATTEN
14

15
16       Subscribed and sworn to before me this___
17  day of _____, 2014.
18
19
20
                 _____
21
                 Notary Public
22
23  My Commission Expires: _____
24
25

C E R T I F I C A T E

1
2        I, ANNE BOWLINE, a Registered Merit
3   Reporter and a Notary Public of the State of
4   Wyoming, do hereby certify that William Patten was
5   by me first duly sworn to testify to the truth, the
6   whole truth, and nothing but the truth;
7        That the foregoing transcript, consisting
8   of 114 typewritten pages, is a true and accurate
9   transcription of my stenographic notes of the
10  testimony given by the said deponent, together with
11  all other proceedings herein contained;
12       I further certify that I am not related in
13  any manner to any party, witness, or counsel and
14  have no financial or other interest in the outcome
15  of the above-entitled cause.
16       IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my Notarial Seal this 9th day of
18  July, 2014.
19

20       _____

21              ANNE BOWLINE
            Registered Merit Reporter
22

23

24

25  My Commission Expires October 19, 2014.